**WAIT RADIO, a co-partnership, Appellant,**

**v.**

**FEDERAL COMMUNICATIONS COM-MISSION, Appellee,**

**Midwest Radio-Television, Inc., et al., Intervenors.**

**No. 24762.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1971.

Decided March 20, 1972.

Rehearing denied April 26, 1972.

Mr. Ramsey Clark, Washington, D. C., with whom Mr. Kenneth C. Bass, III, Washington, D. C., was on the brief, for appellant.

Mr. Edward J. Kuhlmann, Counsel, F. C. C., with whom Messrs. Richard E. Wiley, Gen. Counsel at the time the brief was filed, John H. Conlin, Associate Gen. Counsel at the time the brief was filed, Stuart F. Feldstein and Charles M. Firestone, Counsel, F. C. C., were on the brief, for appellee.

Mr. Michael Finkelstein, Washington, D. C., with whom Messrs. Peter Shuebruk, Herbert M. Schulkind, Howard J. Braun, R. Russell Eagen and Erwin G. Krasnow, Washington, D. C., were on the brief for intervenors. Mr. Martin E. Firestone, Washington, D. C., also entered an appearance for intervenor Carter Publications, Inc.

Before FAHY, Senior Circuit Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case has been here before. It is brought here by WAIT Radio, a co-partnership licensed to operate a Class II-D standard (AM) broadcast station, with 5000 watts of power on 820 kHz from Chicago, on a daytime-only-basis. WAIT is an independent, locally-owned station which broadcasts quality music and public affairs programs designed to appeal to adult audiences. During the day, other stations, elsewhere in the United States, use the 820 kHz channel. At night, however, only WBAP, Ft. Worth, Texas, is authorized to operate on this Class I-A clear channel. 47 C. F.R. 73.25. WAIT petitioned the FCC to enlarge its daytime-only authorization. It seeks to operate full time at 10,000 watts, with a directional antenna system, in order to furnish its distinctive service to almost four and one half million listeners in Chicago.

The Commission met the request for a waiver of its rules by a memorandum opinion that stated that since WAIT's proposal would violate its rules, its application would be returned as unacceptable for filing. 10 F.C.C.2d 481 (1967); reconsideration denied, 11 F.C.C.2d 547 (1968). In WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969) (WAIT-I) we reserved judgment on the merits and remanded to the Commission for their reconsideration. We said that we must be satisfied that the agency had taken a "hard look" at the case, because "[w]hen an application pleads, and offers factual material in support

of, a non-frivolous First Amendment contention, an agency may not dismiss it with the routine treatment that might suffice in the ordinary case."

We recognized the tension between the doctrine of judicial restraint, which requires of us considerable deference to agency decisions, and the practical necessities of judicial review, which require a minimum standard of articulation, so that we may discern the path which the Commission took on the way to its result. We acknowledged the impossibility of framing a universally applicable formula "for deciding when an agency . . . has crossed the line from the tolerably terse to the intolerably mute," but we identified in this case a number of symptoms, chief among them the perfunctory character of the agency's opinion, which persuaded us that the Commission had not measured up to the minimum standards of decisionmaking.

On remand, the FCC again denied the requested waiver, 22 F.C.C.2d 934, and again denied reconsideration, 22 F.C.C. 2d 1016 (1970). We are now satisfied that the "hard look" has been taken, and that we discern the Commission's path. Thus we address the substantive elements of the appeal, testing whether the FCC exceeded its discretion in denying WAIT's application for authorization to broadcast during nighttime hours. We affirm.

### I. *The Underlying Rules*

This case involves the FCC's clear channel and nighttime broadcast rules. The rules themselves are not under attack, and we begin by sketching their content before identifying the points of dispute.

1. *The Clear Channel Rules.* The FCC's placement of stations on the 107 available frequency channels, each of the width of 10 kHz, with the objective of providing satisfactory signal strength to as many listeners as possible and service of local origin to as many communities as possible, had to take into account behavior of radio signals. Part of the en-

ergy from the transmitting antenna of a broadcast station is called a groundwave which provides the "primary" service used in broadcasting. The groundwave travels closely along the earth's surface; its intensity diminishes with distance but remains relatively constant at any location day and night and from season to season. A "secondary" service is provided by the skywave signal, which refers to that portion of the energy which travels upward from the transmitter into the upper atmosphere. In the daytime, because of the sun, this skywave is absorbed by the atmosphere. At night it is reflected, off layers of the upper atmosphere, back to earth, at distances much greater than the reach of the groundwave signal. While less constant in intensity than groundwave signals, the skywave signals are capable of providing service when free from excessive interference on the same or adjacent channels.[1] Duplication of stations on the same channel to provide local services and to enhance multiplicity of program choices for as many listeners as possible "dilutes the effective range of nighttime skywave propagation to distant rural areas where it may not be possible to provide local transmitters."

The concept of certain channels on which only one station is permitted to broadcast at night has long been accepted in practice. Frequency allocation to unduplicated channels has been a feature of federal communications policy for almost fifty years. "[T]he primary objective of clear channel allocation [is] to render wide area service to residents of less densely populated portions of the country which are beyond the reach of interference-free nighttime service from other classes of stations."[2] An estimated one-half of the land area of the United States receives no usable groundwave

service at night.[3] The FCC calls such underserved areas "white areas." They are concentrated in the mountainous parts of the Middle Atlantic states and in northern New England, the Upper Great Lakes, the Great Plains, the South and the Rocky Mountains area.

In order to bring some service to these white areas, the FCC has by rule reserved twenty-five of the more than one hundred available AM frequencies to the use of clear channels. Prior to 1961, a clear channel was a frequency on which only one station could broadcast during nighttime hours. One problem with this policy of exclusivity—the Commission called it a "persistently plaguing deficiency"—was that, as a result of the policy, populous areas were almost overwhelmed with signals, while sparsely inhabited parts of the country remained without adequate service.

While the population of white areas increased by about 50% during the decade 1947–57, the broadcasting services to these areas stayed at about the same level.[4] The FCC desired to improve broadcast services to white areas, but found that the only feasible route to effectuating such improvement was through a modification of the clear channel policy.[5] In a rule-making proceeding, which culminated in a report and order dated September 13, 1961, the FCC ordered that thirteen of the twenty-five clear channels be "broken down" —in other words, that thirteen of the reserved channels be cleared for licensing to a subordinate broadcaster at night. The subordinate station would be far from the dominant station in miles, and would not be permitted to broadcast unless it protected the dominant station's 0.5 mv/m 50% skywave contour —in other words, no "objectionable interference"[6] within roughly 700 miles

1. Report and Order in the matter of Clear Channel Broadcasting in the Standard Broadcast Band, 31 FCC 565, 567 (1961), hereafter cited as Report.

2. Report, 31 FCC at 575.

3. Report, 31 FCC at 568.

4. Report, 31 FCC at 571.

5. Report, 31 FCC at 569.

6. This term is defined in the FCC rules, 47 CFR § 73.182(w) (table), as an undesired signal whose intensity at a given point is more than one-twentieth of the intensity of the desired signal.

of the dominant station's transmitter—and unless it also furnished some new service to a white area. This rule—usually referred to as "the twenty five percent rule"—requires that at least 25% of the proposed subordinate station's projected audience, or projected territory, must be without present primary nighttime broadcast service.[7]

"The underlying justification [for modifying the clear channel policy] was the compelling need to go as far as possible toward reducing the vast areas which lack any nighttime primary service."[8] The Commission referred to such things as technical and engineering improvements in equipment like directional antennae, which simplified the process of minimizing obnoxious interference; but the polestar of the policy was to service underserved areas. Channel 820—WAIT's channel—was not one of the channels which the Commission ordered available for duplication. It considered the idea of breaking down channel 820, but rejected it:

In selecting 640, 820, 1160 and 100 kc for inclusion in [the no-duplication] group, we have noted that these are the only I-A channels  .  .  .

serving the West; that the West is characterized by vast regions of low population density where skywave signals afford the only nighttime broadcast service; that a choice among skywave signals is not generally available to a substantial part of the West; and that acceptable locations for assignment of new unlimited-time stations on these channels would, in general, be limited to eastern areas already receiving abundant service. Accordingly, at this stage, we preserve the potential for improving skywave service which these channels afford.[9]

The FCC rules define a Class I station as a dominant station operating on a clear channel and designed to render primary and secondary service over an extended area and at relatively long distances.[10] The FCC rules define a Class II station as a "secondary station which operates on a clear channel  .  . and is to render service over a primary service area which is limited by and subject to" interference from Class I stations.[11] There are three different groups of Class II stations. Class II-A and II-B stations are unlimited-time stations—broadcasting 24 hours per day—

---

7. The Clear Channel Rules state, in § 73.22:

(b) *Minimum service to "white" areas.* No Class II–A station shall be assigned unless at least 25 percent of its nighttime interference-free service area or at least 25 percent of the population residing therein receives no other interference-free nighttime primary service.

The Nighttime Broadcast Rules, § 73.24, provide that "An authorization for a new standard broadcast station or increase in facilities of an existing station will be issued only after a satisfactory showing has been made  .  .  . "

(b) (3) That a proposed new nighttime operation or change in frequency of any existing nighttime operation (except Class IV stations) would (i) not cause objectionable interference to any existing station  .  .  . ; and (ii) provide a first primary AM service to at least 25 percent of the area within the proposed interference-free nighttime service area or at least 25 percent of the population residing therein.

8. Report, 31 FCC at 572.

9. Report, 31 FCC at 576–7.

10. 47 CFR § 73.21(a).

From an engineering point of view, Class I stations may be divided into two groups.  .  .  . Class I Stations in Group I–A are those assigned to the channels allocated by § 73.25(a) ; on which, except to the extent provided by that section and by § 73.22, duplicate nighttime broadcasting is not permitted.

.  .  .

The Class I station in group I–B are those assigned to the channels allocated by § 73.25(b), on which duplicate operation is permitted, that is, other Class I or Class II stations operating unlimited time may be assigned to such channels.

§ 73.182(a) (1) (i) and (ii). WBAP, since it is assigned by § 73.25(a), and since it is on a channel reserved exclusively to the dominant station during nighttime hours, is a Group I–A station.

11. 47 CFR § 73.21(a) (2).

with Class II-A stations required to operate with at least 10 kw nighttime. A Class II-D station, WAIT's category, is a limited time station. It may broadcast only from sunrise to sunset.

The regulation entitled "Engineering standards of allocation," 47 C.F.R. § 73.-182, details, among other things, the protected service contours of the two groups of Class I station—that is, the duplicated and the unduplicated dominant stations. A Class I station which is on a duplicated clear channel is protected, at night,

> To the 0.5 mv/m 50 percent skywave contour from stations on the same channel. . . .

As to the other Class I stations, the rules state, 47 C.F.R. § 73.182(u) fn. 7: "Class I-A stations on channels reserved for the exclusive use of one station during nighttime hours are protected from co-channel interference on that basis." While the FCC's brief did not elucidate this peculiar phrasing, its counsel at argument explains that this means that the signal of an unduplicated clear channel is protected on the basis that no other station is allowed on that channel at all. The signal from such favored stations, that is, is protected wherever it goes.

2. *Nighttime Broadcast Rules.* The nighttime broadcast rule is a separate rule, although interrelated with the clear channel rule. It provides that an authorization for a new standard broadcast station or increase in facilities of an existing station will be issued only after a showing has been made:

> That a proposed new nighttime operation or change in frequency in any existing nighttime operation . . . would (i) not cause objectionable interference with any existing station . . .; and (ii) provide a first primary AM service to at least 25 percent of the area within the proposed interference-free nighttime service area or at least 25 percent of the population residing therein.[12]

Thus the nighttime broadcast rules supplement the clear channel rules in terms of avoiding "objectionable interference," and add the 25% new service requirement as a condition for new nighttime operations.

II. *The Commission's Exercise of Its Discretion in Declining To Issue a Waiver*

■■ At the Commission level, WAIT sought a waiver of the FCC's clear channel rule, which as it stands prohibits any station other than WBAP on 820 kHz. It had a heavy burden. As we noted in *WAIT-I*: "An applicant for waiver faces a high hurdle even at the starting gate." 135 U.S.App.D.C. at 321, 418 F.2d at 1157. On its appeal to this court, the burden on WAIT is even heavier. It must show that the Commission's reasons for declining to grant the waiver were so insubstantial as to render that denial an abuse of discretion. In order to evaluate that legal contention, we shall consider the strands of public interest identified by the Commission, repeating as a preliminary observation that the role of the court is not to determine the public interest, but to determine whether the agency's delineation is contrary to law.

*WAIT's Submission*

In broad outline WAIT's submission is as follows. Its proposal would provide an interference-free nighttime signal to approximately 4,400,000 people in the Chicago area. Its operation will be under conditions engineered to insure that no objectionable interference will result to any other station. The Commission has not presented any valid reason why such limited operation should not be permitted.

The development of this submission puts forward several matters. First, WAIT notes that waiver requests in general face an adverse presumption. It agrees that if a waiver would violate the policy of the rule, it can only be justi-

12. 47 CFR § 73.24(b) (3).

fied by an affirmative showing of countervailing considerations. In its case, however, WAIT says that it has shown that its application violates the letter of the rule, but not its policy. On such a showing, it is argued, the rule itself no longer retains an adverse presumption. Though appellant does not use this analogy, its contention seems to liken the situation to the kind of presumption that lays only a burden of coming forward with evidence; once such evidence is adduced, the presumption drops from the case. What is left, then, is a normal application to supply additional service, and that is said to be favored by a presumption in favor of the application. This favoring presumption is related to the public interest in hearing new voices, and to First Amendment considerations.

In support of the premise that its proposal does not conflict with the policies underlying the rules sought to be waived, WAIT says that these policies seek to avoid "objectionable interference" with WBAP's "clear channel" signal in a "white area." WAIT concedes that its proposal would cause some "slight interference" with WBAP's signal in a crescent-shaped area that runs from Kentucky to South Dakota, in which about 2,170,000 people reside. But it points out that this area is served by at least two nighttime primary radio signals, and indeed by at least three primary signals as to more than 95% of this area. Thus the interference area is not "white," and indeed, says WAIT, is not even "grey"—for in view of the strong ground signals available here, the erratic and lesser skywave service available from WBAP is an insubstantial consideration.

WAIT also concedes that its proposal would cause "some interference" with the signals of stations which occupy adjoining clear channels (WCCO, Minneapolis, 830 kHz and WGY, Schenectady, 810 kHz). But this is beyond the "0.5 mv/m-50%" skywave contour that identifies a station's normally protected contours under the FCC rules.

## Policy of Non-Duplicated Channels

The FCC's opinion stated that while its clear channel rule was not sacrosanct, it had concluded in its last rule-making that 12 of the 25 clear channels should not be duplicated at all, in contrast to the 13 clear channels that might be duplicated at night under certain conditions, including avoidance of "objectionable interference." After 16 years of study the Commission issued its 1961 Report embodying the determination to avoid any duplication on 820 and certain other clear channels serving the West, in view of the needs of this area of low population density for skywave service, the fact that acceptable locations for unlimited-time stations on these channels would, in general, be in eastern regions already receiving abundant service. "Accordingly, at this stage, we preserve the potential for improving skywave service which these channels afford."

The Commission stated that WAIT's proposal would hamper the FCC in future allocations regarding nighttime broadcasting on 820 kHz, or possibly in authorizing clear channels with "super power." The Commission gave, for purposes of illustration, the case of station WDAE, Ellsworth, Maine, which has asked by way of a rule-making for permission to broadcast on channel 820 during the night. If this proposal were accepted, there would be no interference with any existing signal, and new service would be furnished to many persons in white areas; but the efficiency of WDAE's proposal would be severely compromised if the WAIT proposal were accepted.

We can appreciate WAIT's frustration in offering a present service that would offer, in its submission, a desirable present service, only to be told it must be rejected on grounds of possible interference with some future service of a nature that is not specified, and indeed that in the nature of the case cannot be specified. We need not consider whether the future potentiality consideration would of itself suffice to justify indefinite retention of a policy maintaining

certain channels as inviolably clear. But it suffices to support the Commission's answer, that WAIT errs in saying it does not ask the Commission to give up a policy. The Commission is being asked to give up a policy of retention to await future developments, and to surrender flexibility in dealing with allocation problems in the future.

WAIT's rejoinder is that it will accept a grant on the condition that the grant must be surrendered when, as and if a future development emerges in fact. This offer is hardly conclusive. An agency can realistically take into account that such a conditional grant would generate a vested interest in fact that undercuts flexibility. The Commission noted the "precedential impropriety of granting a conditional waiver" as of "major concern," and referred to "the almost unimaginable consequences" of such an action unless there is a concomitant showing that the waiver is in the public interest.

The curtailment of future flexibility provides an element of public interest that justifies the Commission in not granting the waiver sought where, as here, the Commission identified aspects of WAIT's proposal which it found raised problems in terms of the public interest.

### Interference

The FCC noted that the WAIT proposal concededly took away a third or fourth service (from WBAP) from millions of people in the crescent area. Although WAIT offered evidence that WBAP is not listened to in this area, there was contrary material before the FCC.[13] And the Commission stressed that it was being asked to cancel this in behalf of a 26th nighttime service in Chicago.

The Commission also considered interference to WBAP beyond its 0.5 mv/m-50 percent skywave contour, and to WCCO and WGY, the stations on the

frequencies adjacent to 820 kHz. WAIT correctly points out that this interference is not defined as "objectionable interference" under the FCC's rules. But the FCC states that while this meant that such interference would not be an impediment if there were reason for the grant, it was still interference. The FCC explained:

> Almost all new allocations for AM stations will cause some interference not recognized as objectionable under our rules. This does not mean, however, that the Commission considers it desirable to permit such interference.

And such interference was unwelcome—and not justified when wrought at the behest of a 26th nighttime service in Chicago.

### Lack of New Primary Service

The Commission stressed that WAIT did not offer any service to an area or population previously without primary service. There is some technical jousting as to whether the 25% rule (supra note 7) is applicable in terms. We find it unnecessary to decide the matter, because obviously the policy is one that the FCC could take into account in deciding whether to grant a waiver. If a 25% new service requirement, assuming service in an area previously without primary service, must be met by an applicant seeking to be licensed for fulltime operation, as a Class II–A or II–B station, the principle of requiring some new service is fairly applicable to a II–D station seeking fulltime operation through a waiver of the nighttime restriction.

That approach would lead, says WAIT, to a situation where no big city station could ever get a waiver. We are not, however, asked to consider whether this factor alone would justify the FCC's action. We merely say it is an element of the public interest the Commission was entitled to consider.

---

13. We are advised that at its oral argument, the FCC was informed that a
WBAP night contest elicited some 1500 entries—mostly from Illinois.

*Programming*

WAIT's presentation to the FCC focused on its programming. We are not entirely happy with some aspects of the FCC's opinion on this phase of the case. WAIT's manager was asked by a Commissioner to define the "quality music" he offered, and he replied that it was semi-classical, and included Broadway show tunes. The FCC opinion contains a footnote that derides this fare as lacking the "unique" character claimed by WAIT, and as not different from that of several other stations. But what about the public affairs programs? WAIT's counsel at oral argument in this court referred to WAIT as spiritually identified with the University of Chicago, and the record contains references to programs under the University's auspices that seem, at least prima facie, to have merit.

The FCC decision states that programming is transitory, and cannot be the basis of structural grants. We take note of this only to make clear that we are not to be taken as necessarily approving that position as a universal premise. But we do not think this an appropriate case to explore the implications of this position. As we read the FCC's opinion, this was not a material element of the decision so much as a jousting point, a pin to prick what was apparently viewed as a pretension.

*Fundamental Approach*

The substance of these various strands of public interest depends on a fundamental approach in weighing the considerations.

Looking at the picture in broad terms, we can fairly describe WAIT's approach as follows: The interferences in its proposal are insubstantial—like coughing in church, a vexation that is minor, all things considered, and must be taken for granted. The skywave service interfered with is relatively unimportant, compared with the significant service from ground waves available in the interference area. The unused air service is an asset that is being wasted, like water passing untapped over a potential damsite.

The Commission's broad approach can be put in these terms, obviously with some simplification: The skywave service is meaningful, though inferior. The interference, though minor, is unwelcome—especially on an incremental basis. And the one-time liberality of providing new service is an approach that must be re-evaluated in order to avoid excessive interference and congestion.

Perhaps this approach of the Commission will be reshaped in the light of new technology. Perhaps, as WAIT claims, the Commission is being overly rigid, even in the light of today's technology. The reviewing court has a role that is supervisory, but must be exercised with restraint. There are respects in which the commission's opinion presents problems, some of which we have identified. On balance we have no warrant for saying that the Commission has failed on remand to comply with our order that it take a "hard look" at the matter and identify its reasoning. And we have no warrant for saying that the Commission's approach is either devoid of rationality, or is to be condemned as arbitrary and an abuse of discretion.

Affirmed.