STRAUS COMMUNICATIONS,
INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee.

STRAUS COMMUNICATIONS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and the United States of
America, Respondents,

Congressman Benjamin S.
Rosenthal, Intervenor.

Nos. 75–1083 and 75–1084.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 1975.

Decided Jan. 16, 1976.

Benno C. Schmidt, Jr., New York City, with whom Marcus Cohn and Joel H. Levy, Washington, D. C., were on the brief, for appellant in No. 75–1083 and petitioner in No. 75–1084.

Charles H. Bell, Jr., Counsel, F.C.C., with whom Ashton R. Hardy, Gen. Counsel, and Daniel M. Armstrong, Acting Associate Gen. Counsel, F.C.C., and Carl D. Lawson, Atty., Dept. of Justice, were on the brief, for appellee in No. 75–1083 and respondents in No. 75–1084. Joseph A. Marino, Associate Gen. Counsel, F.C.C., at the time the record was filed, also entered an appearance for appellee in No. 75–1083 and respondent Federal Communications Commission in No. 75–1084.

Collot Guerard, Washington, D. C., with whom Harvey J. Shulman, Washington, D. C., was on the brief, for intervenor in No. 75–1084.

Henry Geller, Washington, D. C., as *amicus curiae*.

Before WRIGHT, LEVENTHAL and WILKEY, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This case gives rise to significant questions concerning application of the Personal Attack Rule promulgated by the Federal Communications Commission, a rule which is an important component of the Fairness Doctrine.

I

Appellant-petitioner Straus Communications, Inc. (hereinafter the station) holds a license to operate Radio Station WMCA in New York City. It fills its programming time primarily with call-in talk shows permitting listeners to telephone the station and discuss with the program host nearly any topic that interests them. On the morning of March 8, 1973 the host of the Bob Grant Show began the program by reviewing the news of the day, including the nationwide meat boycott then in progress. He indicated that the show would try to

contact Representative Benjamin S. Rosenthal, a local congressman who had become a leader in the national boycott. At about 10:30 the producer signalled to Grant that Rosenthal was being phoned, but by 10:45 Grant learned that Rosenthal had refused to come on the air for an interview. He told the audience of this refusal, speculated that it might have resulted from differences Grant and Rosenthal had had in the past, and emphasized that he nonetheless agreed with Rosenthal on the boycott issue. In an affidavit Grant filed with the Commission he stated:

> I also recall saying that I couldn't believe that the Congressman was afraid to come on with me and besides he shouldn't let his personal feelings toward me get in the way of discussing a public issue. I then went on to say something to the effect of, "So, Congressman, if you're listening, lay aside your own prejudices and let the public benefit from hearing you."[1]

At about 12:45 Grant conversed on the air with a caller who vaguely suggested some unspecified improprieties involving mothballed Government ships at Haverstraw, New York, and then launched into extravagant praise of Grant. The conversation concluded:

> Caller: Too bad there ain't more people like you on the air.
>
> Grant: Well, when I hear about guys like Ben Rosenthal, I, I have to say I wish there were a thousand Bob Grants 'cause then you wouldn't have . . . wouldn't have . . . a coward like him in the United States Congress. Thank you for your call, sir.[2]

Within a few hours Rosenthal heard about the 12:45 remark and sent a telegram to the station demanding a transcript. The station complied, but its letter accompanying a brief transcript of the 12:45 incident made no mention of the 10:45 remarks, and failed to offer Rosenthal an opportunity to respond to Grant's comments. Rosenthal filed a complaint with the Commission alleging that the station had violated the Commission's Personal Attack Rule. That rule provides:

> (a) When, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group, the licensee shall, within a reasonable time and in no event later than 1 week after the attack, transmit to the person or group attacked (1) notification of the date, time and identification of the broadcast; (2) a script or tape (or an accurate summary if a script or tape is not available) of the attack; and (3) an offer of a reasonable opportunity to respond over the licensee's facilities.[3]

The Broadcast Bureau undertook to investigate the complaint. After receiving a series of letters and supporting material filed by both Rosenthal and the station, the Bureau sent the station a Notice of Apparent Liability. In it the Bureau announced the 12:45 remarks came within the rule (although the 10:45 comments did not), and, since the station concededly had not followed the required notification and offer procedure, it was subject to a $1,000 forfeiture under 47 U.S.C. § 503(b) (1970).[4] The station con-

---

1. JA 46–47.

2. JA 22.

3. 47 C.F.R. § 73.123 (1974). Subsection (b) contains a number of exceptions to the rule, none of which are germane to the case before us. Subsection (c) contains the so-called political editorial rule, also inapplicable to the case here.

4. That section provides, in pertinent part:

    *(b) Violation of rules, regulations, etc.; notice of apparent liability; limitation of forfeiture liability.*

    (1) Any licensee or permittee of a broadcast station who—

    \*　　\*　　\*　　\*　　\*　　\*

    (B) willfully or repeatedly fails to observe any of the provisions of this chapter or of any rule or regulation of the Commission prescribed under authority of this chapter or under authority of any treaty ratified by the United States,

    \*　　\*　　\*　　\*　　\*　　\*

    shall forfeit to the United States a sum not to exceed $1,000. Each day during which such violation occurs shall constitute a sepa-

tested its liability and filed a further extensive pleading with the Commission.

The Commission issued a letter containing its final ruling on the complaint on January 8, 1975, 51 FCC2d 385 (1975), and it is this letter which constitutes the Commission's "order" now before us for review. Over one dissent the Commission fundamentally upheld the Bureau's interpretation of the Personal Attack Rule. In language that bears importantly on our decision here the Commission summarized its holding:

> In conclusion, *we believe* that referring to Congressman Rosenthal as "a coward" constituted an attack on his honesty, character, integrity or like personal qualities. *We also believe* that although the attack occurred immediately after comments related to warships harbored at Haverstraw, New York, it was a part of a continuing discussion of the nationwide meat boycott and the Congressman's role therein, and therefore was within the context of a controversial issue of public importance.[5]

However, because of certain "novel aspects" of the case, such as the time lapse between the issue discussion and the attack, the Commission rescinded the Notice of Apparent Liability.

> [W]e conclude this was not the type of flagrant violation for which a forfeiture is warranted. * * * You are notified, however, that the Commission

expects full compliance by licensees with the personal attack rule, and that any future violations by the licensee will be dealt with accordingly in light of the foregoing discussion of the application of the rule.[6]

The station has filed both a petition for review of and an appeal from this ruling, charging that the Commission improperly applied the Personal Attack Rule in finding a violation here, and that the rule, as applied, violates the Constitution. Congressman Rosenthal appeared before us as intervenor in support of the Commission, and we granted Mr. Henry Geller, a long-time student of the FCC and the Fairness Doctrine, leave to participate as *amicus curiae* presenting his position on the constitutional limits to the FCC's handling of Fairness Doctrine complaints. We agree with the station that the Commission has improperly applied its own rule or, at best, has failed to indicate that it employed the proper standard for reviewing licensee actions. We therefore remand the case without reaching the constitutional issues tendered by the station or by *amicus.*

## II

We are met at the threshold by a question of jurisdiction, for the station has filed two actions, here consolidated, invoking our review: one an appeal under 47 U.S.C. § 402(b) (1970),[7] the other

---

rate offense. Such forfeiture shall be in addition to any other penalty provided by this chapter.

5. JA 6 (emphasis added).

6. *Id.*

7. *(b) Right to appeal.*
   Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:
   (1) By any applicant for a construction permit or station license, whose application is denied by the Commission.
   (2) By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.
   (3) By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any

rights thereunder, whose application is denied by the Commission.
   (4) By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.
   (5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.
   (6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1)—(4) of this subsection.
   (7) By any person upon whom an order to cease and desist has been served under section 312 of this title.
   (8) By any radio operator whose license has been suspended by the Commission.

a petition for review under 47 U.S.C. § 402(a) (1970).[8] This is, to say the least, a novel stance for the station to take, since the two subsections by their own terms are mutually exclusive. Section 402(b) relates primarily to a class of cases where the Commission has granted, denied, or modified a broadcasting license or construction permit. The station argues it may invoke this subsection since the Commission's order here is "ancillary" to the licensing process. We have found no support for this proposition. It would effectively make all Commission orders reviewable under Section 402(b) contrary to the manifest intent of the Act, and we therefore reject it. The appeal in No. 75–1083 is dismissed.

■ The petition under Section 402(a) remains to be considered. Language in some of our cases might leave the impression that all FCC actions of whatever kind not appealable under Section 402(b) are automatically reviewable under Section 402(a). *See Columbia Broadcasting System, Inc. v. FCC*, 93 U.S.App. D.C. 399, 402, 211 F.2d 644, 647, *cert. denied*, 348 U.S. 876, 75 S.Ct. 112, 99 L.Ed. 689 (1954). But the question is not quite that simple. That the FCC's letter here is not called an "order" is of course no obstacle,[9] but there still must be some modicum of injury, some concrete effect upon the station sufficient to support a court's jurisdiction. The letter, however, imposes no immediately obvious sanction; in fact, it explicitly rescinds the monetary sanction the Bureau had recommended. The station argues that the letter nonetheless places a "substantial

cloud" upon its activities. The Commission responds that the letter will have no "foreseeable consequence" for the station, and that the agency simply used the occasion of the letter to clarify a "timing" problem—to indicate that an attack will be considered to have occurred "during" a discussion of a controversial issue of public importance if it is sufficiently related to a previous discussion of such an issue, notwithstanding a substantial time lapse. The Commission argues that this interpretation is especially important for call-in talk shows, where the conversation necessarily jumps randomly from issue to issue.

■ There may be letters of the kind the Commission says this is—mere general statements of policy with respect to an existing rule which are then published, as this one was, in the *FCC Reports* for future application evenly to all licensees. But, despite rescission of the forfeiture, this letter cannot be considered in that category. It has a concrete effect on this particular licensee, over and above its prospective impact on all licensees. The letter clearly indicates the Commission's belief that the station's actions *in this case* already constituted a violation, even if not a violation so flagrant as to merit a monetary penalty. If the Commission's order stands, this infraction becomes a permanent part of the station's record. This in all likelihood means that future violations by this station would stand to suffer harsher treatment than similar violations by other stations.[10] This probability is enough to establish a present effect sufficient to

---

8. *(a) Procedure.*

    Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 19A of Title 5.

Chapter 19A of Title 5 has been superseded by 28 U.S.C. § 2341 *et seq.* (1970). 28 U.S.C. § 2342 provides in pertinent part:

    The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

    (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47[.]

9. [U]nder § 402(a) [review is available] only if the Commission's order promulgating the regulations is an "order" within the meaning of this section. The particular label placed upon it by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive. * * *

    *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942).

10. *See* 47 U.S.C. § 503(b)(1), *quoted in* note 4 *supra* (forfeiture applies only to willful or *repeated* violations).

make the letter a final order ripe for review on the petition of the station. *See United States v. Storer Broadcasting,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed.2d 1563 (1942). *Contrast Bethesda-Chevy Chase Broadcasters, Inc. v. FCC,* 128 U.S.App.D.C. 185, 186, 385 F.2d 967, 968 (1967) (*per curiam*).

## III

■ The Personal Attack Rule was promulgated in its present form in 1967, although in a somewhat less specific formulation it had governed FCC rulings for many years. *See, e. g., Clayton W. Mapoles,* 23 P & F Radio Reg. 586, 591 (1962); *Billings Broadcasting Co.,* 23 P & F Radio Reg. 951, 953 (1962); *Times-Mirror Broadcasting Co.,* 24 P & F Radio Reg. 404, 406 (1962); *Springfield Television Broadcasting Corp.,* 4 P & F Radio Reg.2d 681, 685 (1965). The rule is a component part of the Fairness Doctrine, but it is useful to keep in mind the differences between the operation of the generalized doctrine and the rule. The Fairness Doctrine [11] imposes a general requirement that licensees provide adequate coverage of issues of public importance, and that the coverage fairly reflect differing viewpoints on controversial issues of public importance. *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 111, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). There is no requirement that the opposing views be aired in the same program, or even in the same series; they must simply find a place in the station's overall programming. The format and the choice of a spokesman for the competing views are left to the licensee's discretion, "subject only to a standard of reasonableness and good faith." *Fairness Report,* 48 FCC2d 1, 8 (1974).[12]

■ The Personal Attack Rule imposes a more specific duty. The licensee must notify the person attacked within seven days and provide a script or tape of the attack, and must take the initiative to offer a reasonable opportunity to reply over the licensee's facilities. This offer must be extended directly to the person or group attacked; the station lacks the control over format and spokesman it maintains under the general Fairness Doctrine, although it does have some latitude to negotiate over what constitutes a reasonable opportunity to reply. The Commission stresses that the rule is not meant to ban hardhitting personalized comments. In fact, the whole point of the rule is to foster "wide open, robust debate on issues of public importance." [13] *See Personal Attacks; Political Editorials* (hereinafter cited as *Personal Attack Rule*), 8 FCC2d 721, 725 (1967). Attacks by no means constitute

11. The Fairness Doctrine originally evolved under the authority of general provisions of the Communications Act calling for regulation in the "public interest." *See, e. g.,* 47 U.S.C. §§ 303(g), 307(a), 309(a) (1970). It has since received explicit statutory recognition, in the 1959 amendments to the section requiring "equal time" for political candidates, 47 U.S.C. § 315(a) (1970). That section now provides, in pertinent part:

> Nothing in the foregoing sentence [relating to equal time for political candidates] shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

The Personal Attack Rule should also be distinguished from the Equal Time provisions; the rule does not require mathematical equality in the time allotted to the two sides. The person attacked is only entitled to a "reasonable opportunity to respond."

12. An appeal from the *Fairness Report* has been docketed in this court, *National Citizens Committee for Broadcasting v. FCC,* No. 74–1700 (July 3, 1974), but proceedings have abated pending the Commission's reconsideration of its Report.

   *See also Editorializing by Broadcast Licensees,* 13 FCC 1246 (1949), the seminal statement of the doctrine. On the standard of "reasonableness and good faith" in particular, *see id.* at 1255–1256.

13. *Richard S. Manne,* 26 FCC2d 583, 584 (1970). *See L. E. White, Jr.,* 11 FCC2d 687, 688 (1968).

misbehavior on the part of the licensee[14] so long as the station provides adequate opportunity for the person or group attacked to continue its side of the debate.

■ The rule contains one highly significant limiting principle. Not all personal attacks give rise to reply time, because the purpose of the rule is not to use the public airwaves to vindicate private reputation; it is rather to advance public debate of public issues.[15] *Id.* at 725; *cf. Healey v. FCC*, 148 U.S.App. D.C. 409, 414–415, 460 F.2d 917, 922–923 (1972). For this reason the rule applies only when the attack occurs "during the presentation of views on a controversial issue of public importance." *See Personal Attack Rule, supra*, 8 FCC2d at 724–725.

■ Broadcasters launched a major constitutional challenge to the rule in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), but the Supreme Court held that the rule as applied therein does not violate the First Amendment. Given the scarcity of the public airwaves, and hence the limited number of broadcasters who can be accommodated, the Court held that the rule forms an acceptable means for promoting the public's "paramount" First Amendment interest in receiving a multiplicity of ideas and viewpoints. *Id.* at 390, 89 S.Ct. 1794. Despite this holding, important constitutional questions continue to haunt this area of the law. The doctrine and the rule do, after all, involve the Government to a significant degree in policing the content of communication. The continuing questions have been canvassed elsewhere and need not be reviewed in detail here.[16] The abiding First Amendment difficulties, however, along with an appreciation of Congress' intent in enacting the Communications Act, have engendered an important corollary: the licensee is to have the maximum editorial freedom consistent with its position as public trustee of a portion of the airwaves.[17]

■ Out of sensitivity to this principle, the Commission has evolved a unique and narrow standard to guide its review when a licensee is charged with violating the Fairness Doctrine or its subsidiary rules, including the Personal Attack Rule. The agency will find a violation only where it determines that the licensee's actions and decisions have been unreasonable or in bad faith. This standard applies to all components of the doctrine; it is the licensee, in the first instance, who decides, for example, exactly what issue is involved and whether that issue is controversial and of public importance.[18] Its judgment on these

14. *Personal Attack Rule*, 8 FCC2d 721, 723 (1967). It is possible to conceive, of course, an extreme case of a licensee which devotes so much of its programming to personal attacks that serious questions arise as to whether the licensee is operating in the public interest. Whether or not this would be grounds for revocation or nonrenewal of a license, it is not the main concern of the Personal Attack Rule.

15. The fact that an attack might not fall within the Commission's Personal Attack Rule would not, of course, relieve the station or its spokesman from possible liability under the defamation laws.

16. *See Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 126, 132, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *id.* at 137, 146, 93 S.Ct. 2080 (Stewart, J., concurring); *National Broadcasting Co., Inc. v. FCC* (hereinafter cited as "*Pensions*"), 170 U.S.App.D.C. 173, 182–185, 516 F.2d 1101, 1110–1113 (original panel opinion by Judge Leventhal); *id.* at 1173–1177 (1975) (opinion of Chief Judge Bazelon dissenting from order vacating previous order granting rehearing *en banc*). The *Pensions* judgment was ultimately vacated after enactment of pension reform legislation, *id.* at 1180 (1975), but the numerous opinions filed in the case stand as important statements of the views of members of this court on the knotty issues involved in application of the Fairness Doctrine. *See also Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 393, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

17. *See Columbia Broadcasting System, Inc. v. Democratic National Committee, supra* note 16, 412 U.S. at 109–111, 126, 132, 93 S.Ct. 2080, 36 L.Ed.2d 772; *id.* at 137, 146, 93 S.Ct. 2080 (Stewart, J., concurring); *Pensions, supra* note 16, 516 F.2d at 1113 (original panel opinion by Judge Leventhal). *Cf. Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

18. *Fairness Doctrine Primer*, 40 FCC 598, 599 (1964). Some have suggested that a stricter standard for review by the Commission would be appropriate as to some elements of the de-

points will be overturned only where the Commission finds that the judgment transcends the bounds of reasonableness and good faith. This standard of review has regularly been employed by the Commission in personal attack cases. *Personal Attack Rule, supra,* 8 FCC2d at 724–725; *Sidney Willens and Russel Millin,* 33 FCC2d 304, 306 (1972); *Robert B. Choate,* 29 FCC2d 73, 74 (1971). See *Polish American Congress v. FCC,* 520 F.2d 1248, 1252–1253 (7th Cir. 1975).

## IV

The station argues that had the proper standard been applied here the Commission could not, on a number of grounds, have found a violation. The station acted reasonably, it asserts, in believing that no personal attack had taken place within the meaning of the rule. We discuss at length only one of the grounds for challenge, namely, the station's allegation that the attack did not take place "*during* the presentation of views on a controversial issue of public importance." [19]

The "coward" remark appeared in the midst of a discussion of mothballed ships. Were the Personal Attack Rule literally applied, the only inquiry would be whether this particular issue was controversial and of public importance, and it would be hard indeed to find that it was. The Commission, however, did not pass on the significance of the mothballed ship issue. Instead it built on earlier FCC statements and rulings which have interpreted the word "during" [20] and held that the rule includes attacks "re-

cisions the Fairness Doctrine requires, for example, whether a given issue is controversial. *Pensions, supra* note 16, 516 F.2d at 1170–1174 (opinion of Chief Judge Bazelon); *id.* at 1196 (opinion of Judge Tamm concurring in order vacating original judgment). But the Commission itself apparently adheres to the view that licensee judgment on these points will be reviewed under the same standard of "reasonableness and good faith." *Fairness Report,* 48 FCC2d 1, 11–13 (1974). See note 12 supra.

The Commission's use of the "reasonableness and good faith" standard in reviewing licensee actions allegedly in violation of the Fairness Doctrine has received frequent endorsement from this court and other courts. *See, e. g., Neckritz v. FCC,* 163 U.S.App.D.C. 409, 416, 502 F.2d 411, 418 (1974); *Brandywine-Main Line Radio, Inc. v. FCC,* 153 U.S. App.D.C. 305, 333, 473 F.2d 16, 44 (1972), *cert. denied,* 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973); *Democratic National Committee v. FCC,* 148 U.S.App.D.C. 383, 395, 460 F.2d 891, 903, *cert. denied,* 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972); *Green v. FCC,* 144 U.S. App.D.C. 353, 359–360, 447 F.2d 323, 329–330 (1971); *Neckritz v. FCC,* 446 F.2d 501, 502–503 (9th Cir. 1971). *See also Pensions, supra* note 16, 516 F.2d at 1118 (original panel opinion by Judge Leventhal).

19. Under the Personal Attack Rule, two elements must be present before a station is required to offer reply time. (1) There must be an attack upon "honesty, character, integrity or like personal qualities." And (2) that attack must have taken place "during the presentation of views on a controversial issue of public importance." Part (2) is discussed in text. The station makes a subsidiary argument with respect to part (1). The word

"coward" should not have been considered an attack on honesty, character, or integrity, says the station, since the word carries some dictionary meanings which do not implicate the physical courage of the individual so labeled. We think this is an overly technical application of the rule; it strains the limits of reasonableness to assert that listeners would have considered the word "coward" anything but an attack on character, whether or not the label was intended to impugn physical courage. It would be proper for the Commission to find, even applying its generous "reasonableness and good faith" standard of review, that Grant's remark came within part (1) of the rule, whatever the determination as to part (2).

The station also seems to assert, without pressing the point very strenuously here, that it was in substantial compliance with the rule since it had in effect offered Rosenthal air time for expressing his views during the 10:30 phone call to Rosenthal's office and since it had, some months later, made a generous oral offer of reply time—an offer Rosenthal declined. The Commission rightly rejected the notion that "substantial" compliance is adequate. If an attack has taken place within the meaning of the rule, it is entirely proper for the Commission to insist on strict compliance with the notice and offer requirements the rule sets forth. Only in this way can the salutary purposes the rule is meant to serve be genuinely realized. *See Capitol Broadcasting Co., Inc.,* 2 P & F Radio Reg.2d 1104, 1108 (1964).

20. *Personal Attack Rule, supra* note 14, 8 FCC2d at 724–725; *Southern California Broadcasting Co.,* 42 FCC2d 1106, 1108–1109 (1973); *Richard S. Manne, supra* note 13, 26 FCC2d at 584.

lated to" or "within the context of" a discussion of an important and controversial issue. Using this approach the Commission apparently found that the "coward" remark here related to the meat boycott, which all parties concede was a controversial issue of public importance.

■■■ The station, in contrast, judged that the remark did not relate to the meat boycott,[21] and it makes a substantial argument here, as it did before the Commission, in support of its position. The 12:45 reference to Rosenthal was indeed fleeting, appearing abruptly in the midst of a discussion of ships to which Rosenthal had no ostensible relationship. The meat boycott, so far as this record reveals, had not been mentioned for a full two hours, and even at 10:45 there were only limited remarks tying Rosen-

thal to the boycott. Finally, in an important sense the "coward" remark did not relate to the boycott at all. Grant had made it clear that he agreed with the congressman on that issue, and his unfortunate comment related primarily to his private pique over Rosenthal's refusal to appear on his show.[22]

■■■ These could hardly be called insubstantial reasons for the station to think that the attack did not fall within the rule. To find a violation, despite the strong arguments the station mustered, would therefore require from the Commission a careful statement of why those arguments do not reasonably support the station's conclusion. The Commission's letter contains no such statement. Instead we have only the Commission's own *de novo* judgment on the matter. The Commission states that it "believes"

---

**21.** The Commission, in its brief at 14, impliedly challenges the reasonableness and good faith of this judgment by the station on the ground that the station exercised no such judgment until months after the incident. It is true that the station did fail to focus, in the early stages of this proceeding, on the question whether the attack related to the meat boycott issue. It rested its early defense instead on the position that it had offered reply time, orally, shortly after the incident and was therefore in substantial, if not technical, compliance with the rule. Only when it became clear, months later, that no such oral offer had been made, did the station begin to argue that the meat boycott issue was not involved. This late rationalization is not the kind of journalistic judgment entitled to deference—so the Commission argues.

However, the Commission's letter makes no reference to this argument as a ground for its decision, and we are aware of no other Commission statement or ruling which even hints that the Commission will defer to licensee judgments only if they are exercised within moments of the alleged violation. Moreover, as long as the station believed—albeit erroneously—that it really had not violated the rule even if there had been an attack, it is not surprising that the station failed to focus on what has proved to be the crucial question. If the station was right on its substantial compliance assertion, there was no need to consider the more complex question of whether the remarks implicated a controversial issue of public importance. To say this is not to condone the station's apparent negligence in failing to discover that no oral offer was in fact made, nor to endorse the assertion that "substantial"

compliance with the rule is adequate. *See* note 19 *supra.*

If a licensee, out of an abundance of caution, offers time to respond to a personal attack even though not made during, or in a program related to, the presentation of views on a controversial issue of public importance, it would not be precluded from later asserting that it was under no legal duty to provide such an offer.

**22.** Before the Commission the station summarized its position in this way:

The Broadcast Bureau's conclusion that an isolated and unexplained reference to Congressman Rosenthal as a coward somehow reflected a controversy about the meat boycott is not realistic in the context of the broadcast. No listener having heard the 10:45 a. m. remarks could reasonably conclude that Grant's 12:45 p. m. comment reflected anything more substantial than Grant's continued pique at Rosenthal's refusal to be interviewed. A listener who heard only the 12:45 comment would not be able to relate it to anything. * * *
JA 79.

The Commission did not pass on the question whether the congressman's refusal to be interviewed on the Grant show might itself be a controversial issue of public importance. This question is open to the Commission on remand, but we do note that the Commission has in the past kept its distance from "the mistaken impression that an attack on a specific person or group constitutes, itself, a controversial issue of public importance requiring the invocation of the *Fairness Doctrine.*" *Personal Attack Rule, supra* note 14, 8 FCC2d at 725.

the comment was sufficiently related to the earlier meat boycott remarks to "constitute a continuing discussion of that issue" and hence to come within the rule. Thus the Commission applied the wrong standard. It made its own judgment, instead of judging the objective reasonableness of the licensee's determination. At best, the Commission expressed carelessly what must be a careful statement of reasons for rejecting the licensee's explanation of its actions.

We are aware that "busy agency staffs are not expected to dot 'i's' and cross 't's'."[23] And we know that courts are generally "indulgent toward administrative action to the extent of affirming an order where the agency's path can be 'discerned' even if the opinion 'leaves much to be desired.'"[24] But here we cannot fairly discern that the agency has in fact applied the proper standard of review. And in Fairness Doctrine cases that standard is itself so closely linked to protection of broadcasters' First Amendment rights that we cannot indiscriminately apply the principle of indulgence toward agency action.[25] Critics have charged that the "reasonableness and good faith" standard is merely a screen behind which the Commission shelters when it upholds licensee actions without being able to give adequate reasons.[26] One need not endorse that view to appreciate the genuine danger it descries. It is imperative that the Commission, in applying its "reasonableness and good faith" standard, make clear—to itself and to others—by articulation of appropriate reasons, that it is applying the same standard, both where it finds a violation and where it upholds the licensee. We remand the case for the Commission appropriately to apply the proper standard.

One further observation is in order. The Commission's decision amounted to a significant extension of the Personal Attack Rule to embrace instances where an alleged attack is separated by a substantial time lapse from the issue discussion to which it supposedly relates. There are previously reported staff rulings which, with hindsight, may be seen as laying the groundwork for the ruling here.[27] The Commission's letter nonetheless acknowledges that this was a "novel" application of the rule. The licensee's violation, then, consisted fundamentally in failing to predict the new interpretation.[28] In its mention of "novel aspects" of the case the Commission basically concedes this point; such a concession comes very close to saying that the station's action could not have been unreasonable or in bad faith. In this light the Commission would carry a heavy burden to find, on remand, a violation of the Personal Attack Rule.

**23.** WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969), affirmed after remand, 148 U.S.App.D.C. 179, 459 F.2d 1203, cert. denied, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972).

**24.** Id.

**25.** Indeed, in WAIT Radio itself the matter was remanded to the Commission for a more careful statement of reasons on the ground that the Commission's decision unavoidably involved important First Amendment issues. Id.

**26.** See San Francisco Women for Peace, 24 FCC2d 156, 162 (1970) (Johnson, Comm'r, dissenting); Pensions, supra note 16, 516 F.2d at 1172 n. 47 (opinion of Chief Judge Bazelon).

**27.** Southern California Broadcasting Co., supra note 20; Richard S. Manne, supra note 13. Under scrutiny in Southern California was a three-part broadcast. The primary discussion of the issue, along with the words that constituted the attack, appeared the first day, and the naming of particular individuals did not come until the second day. In marked contrast to the instant case, however, the broadcast made abundantly clear that the second day's comments were a continuation of the first day's.

**28.** We do not say that the Commission is barred from interpreting the Personal Attack Rule in this fashion. We suggest only that the Commission is on shaky ground if it finds the station's action unreasonable before it has announced the new interpretation for prospective application.

This is not to say that a licensee can ignore the Personal Attack Rule, without risk, because every new application, to an obviously new state of facts, has some element of novelty. Here there was not only a novelty as to the factual application of a well understood general rule, there was in substance a change of the FCC's rule so that "during" became broadly "related to."

*Appeal in No. 75–1083 is dismissed. In No. 75–1084 the order is vacated and the case is remanded for further proceedings not inconsistent with this opinion.*