Dear Sen. Irons:
You requested the opinion of this office concerning applications which have been submitted to the State Bond Commission in connection with the St. Thomas projects. The Industrial Development Board of the City of New Orleans (the "IDB") is requesting final approval for two bond issues. One is to finance the acquisition, construction and equipping of a Wal-Mart SuperCenter. The other is to finance the cost of a project consisting of the acquisition, construction and installation of a mixed use residential/commercial development facility. In addition to the two IDB bond issues, the City of New Orleans is requesting approval of not exceeding $20,000,000 Sales Tax Incremental Revenue Bonds for construction of a mixed-income housing development on the site of the former St. Thomas public housing development.
Your first question is whether the State Bond Commission can consider a motion for final approval of a bond application from the IDB, if the bond resolution adopted by the IDB on July 16, 2002, has been effectively withdrawn by the IDB and re-considered by the IDB at its meeting on October 15, 2002?
It is our understanding that this question pertains to the resolutions adopted in connection with the Wal-Mart SuperCenter and not to the housing issues. Bond counsel has furnished this office with copies of three pertinent resolutions of the IDB. Furthermore, the undersigned reviewed the records on file with the State Bond Commission.
The first resolution is dated October 17, 2000 (the "October 17, 2000 Resolution") and authorizes the IDB to execute a preliminary agreement with Historic Restoration, Inc. ("HRI") and authorizes the issuance of not to exceed $172,000,000 in revenue bonds to finance the acquisition, construction and installation of multi-family residential housing facilities as described and defined in the Preliminary Agreement to be entered into by the IDB and HRI (the "Preliminary Agreement") to revitalize the St. Thomas Public Housing Project. The appropriate officers of the IDB were authorized to take any and all further action necessary to carry out the purposes of the resolution including filing an application with the State Bond Commission for preliminary approval. This resolution was approved by a vote of 10 yeas, 0 nays and 5 absents. The Preliminary Agreement attached to the October 17, 2000 Resolution defines the Project as "the revitalization of the St. Thomas Public Housing Project into housing, retail and commercial facilities and construction of offsite residential facilities primarily for displacement of St. Thomas Public Housing tenants in the City of New Orleans".
By a vote of 9 yeas, 0 nays and 6 absents, on July 16, 2002, the IDB passed a resolution authorizing the issuance of not exceeding $28,000,000 of taxable revenue bonds (the "July 16, 2002 Resolution"). The July 16, 2002 Resolution refers to the Preliminary Agreement dated October 17, 2000 with HRI. The proceeds of the bonds referred to in the July 16, 2002 Resolution are to be used to finance the cost of acquiring, constructing and equipping the Project, which is defined as the revitalization of the St. Thomas Public Housing Project into housing, retain and commercial facilities and construction of off-site residential facilities primarily for displacement of St. Thomas Public Housing in the City of New Orleans, by the acquisition, construction and equipping of a Wal-Mart SuperCenter in the City of New Orleans. The July 16, 2002 Resolution also authorized submission of the bonds to the Secretary of the Department of Economic Development and to the State Bond Commission for approval of a Lease agreement, Indenture, Guaranty Agreement and other documents.
It was later determined that the Board member who moved to approve and voted in favor of the July 16, 2002 Resolution had moved his residence to Jefferson Parish and was no longer domiciled in the Parish of Orleans. Accordingly, this Board member was no longer eligible to be a member of the Board. R.S. 51:1156 provides that the directors of an industrial development board must be duly qualified electors of the municipality or parish with respect to which the corporation was formed.
At the July 22, 2002 meeting of the State Bond Commission, the State Bond Commission approved not exceeding $30,000,000 Taxable Revenue Bonds (Riverview Retail I, L.L.C.), Series 2002, to finance the acquisition, construction and equipping of a Wal-Mart SuperCenter. The State Bond Commission Resolution refers to the October 17, 2000 Resolution, but does not mention the July 16, 2002 Resolution.
A third resolution was approved by the IDB on October 15, 2002 by a vote of 6 yeas, 1 nay, 5 absent and 2 abstaining (the "October 15, 2002 Resolution"). This October 15, 2002 Resolution appears to be virtually identical to the July 16, 2002 Resolution. It does not refer to the July 16, 2002 Resolution nor does it contain any language rescinding or repealing the July 16, 2002 or any other previous Resolution.
In answer to your specific question and based upon the foregoing information, it is the opinion of this office that in these particular circumstances, the State Bond Commission can give final approval to a bond application from the IDB, where the bond resolution adopted by the IDB on July 16, 2002, has been effectively withdrawn by the IDB and reconsidered by the IDB at its meeting on October 15, 2002. IDB's are required to obtain both preliminary and final approval of the State Bond Commission prior to the issuance of bonds. R.S. 51:1157.1 and R.S.51:1157.2. From the information supplied to this office, the preliminary approval given by the State Bond Commission was not based upon the July 16, 2002 resolution, rather it was based upon the October 17, 2000 resolution. Accordingly, the July 16, 2002 Resolution is not relevant to the issue of preliminary approval but is relevant to final approval by the State Bond Commission. The State Bond Commission may consider the October 15, 2002 Resolution when it is considering final approval of the bonds.
Even if the State Bond Commission had considered the July 16, 2002 Resolution when it gave preliminary approval, the fact that one of the members of the Board was not eligible to participate does not affect the validity of the July 16, 2002 Resolution. The Resolution was passed by a majority of the members of the IDB present and voting. We also call your attention to the doctrine of "de facto officers". This doctrine, grounded in public policy, proclaims that the acts of a de facto officer are valid as to third persons and the public until the officer's title to office is adjudged insufficient. The U.S. Supreme Court has explained the de facto officer doctrine and its underlying principles as follows:
 The de facto officer doctrine confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient. The de facto doctrine springs from the fear of the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question, and seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office.
 Ryder v. United States, 515 U.S. 177, 180, 115 S.Ct. 2031, 2034,132 L.Ed.2d 136 (1995) (internal citations omitted). Generally, to satisfy the de facto officer doctrine the officer must be in the unobstructed possession of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper. A "de facto" official is one who by some color of right is in possession of office and for the time being performs his or her duties with public acquiescence, though having no right in fact; or, as otherwise stated, a person is a "de facto" officer when he or she is in possession of an office and discharges its functions under color of authority. A person is considered a de facto officer where the duties of the office are exercised: without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him or her to be the officer he or she assumed to be; under color of a known and valid appointment or election, but where the officer failed to conform to some precedent, requirement, or condition, such as to take an oath, give a bond, or the like; under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public; or under color of an election or an appointment by or pursuant to a public, unconstitutional law, before the same is adjudged to be such. 63C Am. Jur.2d § 23 (footnotes omitted). Louisiana courts have held that until a de facto officer's title to the office is attacked directly and held to be invalid, "the acts of a de facto official are as valid and effectual, when they concern the public or the rights of third parties, as though he were an officer de jure. . . ." State v. Stripling, 354 So.2d 1297, 1300-01 (La. 1978). State v.O'Reilly, 2000-2865 (La. 5/15/01), 785 So.2d 768. See also, Williams v.Police Jury, 160 La. 325, 107 So. 126. Under the de facto officer doctrine, the acts of the board member would be valid unless and until he is ousted in a direct proceeding. Michell v. Louisiana State Board ofOptometry Examiners, 146 So.2d 863 (La.App. 3d Cir. 1962).
Your next question is whether the chairman of the commission, has the authority to waive applicable rules and administrative procedures of the Commission regarding timeliness and completeness of filing of applications, particularly with respect to the requirement of submission of a bond beneficiary's five year financial statements?
The Commission has adopted rules in accordance with the Administrative Procedures Act. R.S. 49:950, et seq. The State Bond Commission rules specify certain dates for the filing of applications with the State Bond Commission, but authorizes the Secretary of the Commission to approve a later filing for an emergency or an extraordinary situation. Financial statements should be submitted with the application. See State Bond Commission Rules 2 and 4.
As to whether rules can be waived, a similar question was addressed in Op.Atty.Gen. 79-1384, which stated in pertinent part as follows:
 The Administrative Procedure Act does not provide for the suspension or waiver of rules or for the adoption of a rule regarding such suspension or waiver. Furthermore, our research uncovers no Louisiana jurisprudence clearly on point. However, I would refer you to 73 C.J.S., Public Administrative Bodies 
Procedures, § 111 wherein the following language is found:
 "While it has been held that the power to make an administrative regulation includes the power to relieve from non-compliance therewith, and that, in special circumstances, a public administrative agency has authority to waive its own rule, or to modify it, ordinarily, such an agency may not waive, suspend, or modify the operation of its own rules and regulations in individual cases, or ignore or violate them . . .'
 In conjunction with the above language referring to the inability of an agency to waive its rules in individual cases, I would refer you to La.R.S. 49:951
(6) defining the term "Rule.' That provision reads in part that a rule may be of general applicability although not applying to the entire state, provided that it is in general form and capable of being applied to every member of a class.
 Regarding what is acceptable in the waiver of a rule, I would refer you to the case of WAIT Radio v. F.C.C., 418 F.2d 1153, affirmed at 459 F.2d 1203. The following language is found at page 1159:
 "The court's insistence on the agency's observance of its obligation to give meaningful consideration to waiver applications emphatically does not contemplate that an agency must or should tolerate evisceration of a rule by waivers. On the contrary a rule is more likely to be undercut if it does not in some way take into account considerations of hardship, equity, or more effective implementation of overall policy, considerations that an agency cannot realistically ignore, at least on a continuing basis. The limited safety valve permits a more rigorous adherence to an effective regulation.
 Sound administrative procedure contemplates waivers, or exceptions granted only pursuant to a relevant standard — expressed at least in decisions accompanied by published opinions, especially during a period when an approach is in formation, but best expressed in a rule that obviates discriminatory approaches. The agency may no act out of unbridled discretion or whim in granting waivers any more than in any other aspect of its regulatory function. The process viewed as a whole leads to a general rule, and limited waivers or exceptions granted pursuant to an appropriate general standard. This combination of a general rule and limitations is the very stuff of the rule of law, and with diligent effort and attention to essentials administrative agencies may maintain the fundamentals of principled regulation without sacrifice of administrative flexibility and feasibility.'
 Based on the foregoing, the answer to your question number one is that the State Bond Commission may waive its rules only in very limited instances and based only on clear precedent such as applicable jurisprudence or statutory law which recognizes the particular situation as the subject of a valid waiver.
* * *
 In answer to your third question, it is the opinion of this office that it is not strictly necessary that the rules and regulations of the Commission provide for a procedure to allow the suspension or waiver of rules and regulations. This is so because the granting of a waiver is only possible in such a small limited number of instances that significant harm would not be done to the promulgated rules if a particular procedure were not published.
* * *
 It should be noted that this opinion deals only with the waiver of substantive rules and not procedural rules. Procedural rules are routinely suspended by public bodies under applicable rules and usually by a majority vote.
Trusting this adequately responds to your request, we remain
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: __________________________ MARTHA S. HESS Assistant Attorney General
RPI:MSH:jv