**CITY OF NEW YORK MUNICIPAL BROADCASTING SYSTEM (WNYC), Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee, WCCO Radio, Inc., Intervenor.**

No. 83–1663.

United States Court of Appeals, District of Columbia Circuit.

Argued March 9, 1984.

Decided Sept. 21, 1984.

As Amended Sept. 25, 1984.

Stephen P. Kramer, New York City, of the Bar of the Appellate Div. of the Supreme Court of the State of New York, pro hac vice, by special leave of the Court, with whom Alfred J. Tighe, Jr., Washington, D.C., was on brief for appellant.

David Silberman, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, and Daniel M. Armstrong, Washington, D.C., Associate Gen. Counsel, were on brief for appellee.

Jerome S. Boros, New York City, with whom Peter Shuebruk, New York City, was on brief for intervenor. Zane M. Unger, New York City, also entered an appearance for WCCO.

Before WRIGHT, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge.

This is an appeal from the Federal Communications Commission's decision to terminate a special exemption given to WNYC, a New York City-owned radio station since 1943. The termination restricts WNYC's broadcast hours and so ends its nighttime co-channel interference with WCCO, Minneapolis. This case has been before the Commission since 1954. We

have jurisdiction under 47 U.S.C. § 402(b) (1982). The case is important both to WNYC's current nighttime listeners and to the future of the FCC's fundamental allocation rules for the AM band. Though we recognize the unique and valuable nature of much of WNYC's programming, and the "significant loss to New York City" that is the inevitable consequence of the Commission's decision, we cannot overturn the agency's reasoned decision. We hold that the Commission rationally weighed the competing policies in determining that the public interest is best served by halting WNYC's long-time interference with WCCO's nighttime operations.

## I.

The procedural history of this case is intimately linked to the issues before us and to the Commission's long and arduous efforts to achieve the best allocation of the broadcase spectrum. Before detailing the protracted procedural history of this case, we will briefly describe the two basic kinds of radio signals, their different propagation characteristics, and the implications for the allocation of AM frequencies of these physical facts.

## A.

Stations operating on standard broadcast (AM) frequencies are assigned to 107 channels in the frequency range of 540–1600 kilohertz (kHz). Stations operating on these frequencies simultaneously transmit a groundwave and a skywave signal. Groundwave signals move horizontally across the earth's surface. The intensity of these signals diminish rapidly with distance and typically radiate between 100 and 150 miles from the transmitter. They are highly dependable and remain relatively constant at any location, day and night, season to season. This is not at all true with skywave signals, that portion of energy travelling from the transmitter upward and outward into the ionosphere. During the day, these signals are absorbed into the atmosphere. At night, however, these signals "bounce" off the atmosphere and are reflected back to earth, often to places far removed from the transmitter. As a result, at night, skywave signals cover areas not covered by the groundwave signals of a particular station. Skywave service is less reliable than groundwave service because the intensity of the signal is affected by a number of factors including time of year, sunspot activity, and atmospheric noise. The Commission rules consider the service provided by these skywaves as "secondary service" and the constant groundwave service is classified as "primary service." *See generally Clear Channel AM Broadcasting*, 78 F.C.C.2d 1345, 1349–50, *reconsideration denied*, 83 F.C.C.2d 216 (1980), *aff'd sub nom. Loyola University v. FCC*, 670 F.2d 1222, 1223–24 & n. 3 (D.C.Cir.1982).

Despite its drawbacks when compared with groundwave service, skywave service can render useful nighttime service over wide areas. But to provide effective service, skywave signals must be protected from other stations on the same frequency, because if a skywave lands in an area already receiving service from another station on the same frequency the two signals may cancel one another out. *Loyola University*, 670 F.2d at 1224 n. 4.

Since 1927, the Commission and its predecessor agency, the Federal Radio Commission, have pursued three basic goals in allocating radio frequencies and in setting conditions on the use of those frequencies:

(1) provision of at least one service to all persons;

(2) provision of service to as many persons from as many diversified sources as possible; and (3) provision of outlets for local self-expression addressed to each community's needs and interests.

*Loyola University*, 670 F.2d at 1223–24, *citing In re Clear Channel AM Broadcasting*, 78 F.C.C.2d 1345, 1349 (1980). To accomplish these goals, the Commission has divided the AM frequency into three groups: local, regional, and clear channel. Stations using the local and regional channels operate at relatively low power and are often authorized to operate during the

day only. By contrast, clear channels are occupied by Class I-A stations. These stations were created as one way of achieving the goal of providing all persons with at least one service. They are high-power stations whose skywave signal is given maximum protection in order to provide secondary service at night to areas of the country—so-called "white areas"—not receiving primary nighttime service from any other station. Clear-channel stations operate day and night with the maximum permissible power of 50 kilowatts (kW) and their signals radiate in all directions. The frequency being fought over here, 830 kHz, is a clear channel frequency, and WCCO Radio, Inc. Minneapolis, Minnesota, WNYC's competitor in this proceeding, is a clear-channel station assigned that frequency.

## B.

The allocation policy described above is the result of many rulemaking proceedings, conducted for close to half a century. Originally, the Commission's rules granted to all Class I-A clear channel stations exclusive use of their frequencies at night. Exclusivity was necessary to bring the twenty-five million people without primary nighttime service some service, even if it was the less desirable secondary service. By 1945, however, the growing demand for more stations made exclusivity increasingly impractical, and the Commission was strongly urged to make the clear channels available to stations other than Class I-A stations. As a result, in that year the Commission instituted a rulemaking proceeding to consider the most efficient way to use the clear channel frequencies. For fifteen years the Commission struggled with the question, and in 1961, the Commission issued a report and order amending its rules. The 1961 amendments authorized full time stations on thirteen of the twenty-five Class I-A clear channels. *Loyola University,* 670 F.2d at 1224, *citing In re Clear Channel Broadcasting in the Standard Broadcast Band,* 31 F.C.C. 565 (1961) (*"Clear Channel Broadcasting"*).[1] The Commission also announced that it would not approve a nighttime assignment on one of the newly opened clear channels unless the subordinate station protected the dominant station's 0.5 mV/m 50% skywave contour.[2] An additional rulemaking, begun in 1975 and concluded in 1980, allowed the existing dominant Class I-A stations, one of which is WCCO, to operate omnidirectionally at 50 kW of power. *Loyola University,* 670 F.2d at 1225.

## C.

WNYC-AM is a municipally owned and operated Class II [3] 1 kW radio station licensed to serve New York City on 830 kHz. It has been operated on a non-commercial basis since 1924 and is devoted completely to public service. WNYC's regularly licensed broadcast day is limited to the time between sunrise in New York City and

1. This court affirmed the Commission's decision in the *Clear Channel Broadcasting* proceeding in *Goodwill Stations, Inc. v. FCC,* 325 F.2d 637 (D.C.Cir.1963).

2. To be considered usable, a signal must be at least .5 mV/m field strength. This is the minimum required to overcome natural and man-made noise. The reference to 50% means that a usable signal must be received half the time at a particular location for that location to fall within the dominant station's protected skywave contour. *See* 47 C.F.R. § 73.182(i) (1983). Once a protected skywave contour is set, a subordinate co-channel station may not place a signal stronger than .25 uV/m inside the protected contour. Generally, this contour is located 700–750 miles from the dominant station's transmitter. *See Clear Channel Broadcasting,* 31

F.C.C. at 573. Although the Commission in 1980 authorized some additional assignments on clear channels, it preserved the rules protecting the dominent stations from interference within their 0.5 mV/m 50% skywave contour. *Loyola University,* 670 F.2d at 1225 n. 6.

3. FCC rules define a Class II station as "a secondary station which operates on a clear channel ... and is designed to render service over a primary service area which is limited by and subject to" interference from Class I stations. 47 C.F.R. § 73.21(a)(2) (1983). There are three different types of Class II stations: Classes II-A and II-B stations, which are unlimited time stations broadcasting 24 hours per day, and Class II–D stations, which may broadcast only from sunrise to sunset.

sunset in Minneapolis because of the interference it causes within WCCO's area of nighttime secondary service, WCCO being the dominant station on the frequency. Since 1943, however, pursuant to a series of year-to-year Special Service Authorizations ("SSA"), WNYC has been permitted to operate from 6:00 a.m. to 10:00 p.m. (EST).[4] The FCC originally gave WNYC permission to operate at night in spite of the co-channel interference to WCCO because WNYC was thought to provide " 'needed wartime services.' " *In re City of New York Municipal Broadcasting System* (WNYC), 15 Rad.Reg. (P & F) 565, 572 (1957) (Initial Decision of Hearing Examiner).[5] This SSA was repeatedly renewed, generally for six months at a time.

In 1951, the owner of WNYC, the City of New York Municipal Broadcasting System, requested authority to renew WNYC's SSA for an additional six months. This application was amended in 1954[6] "to request

---

**4.** Early in October, 1942, WNYC applied for modification of its license to permit operation from 6:00 a.m. until 11:00 p.m. (EST) daily. The Commission denied this request. In re City of New York Municipal Broadcasting System, 9 F.C.C. 169 (1942). Later that same month, WNYC filed for and was granted its first SSA in December, 1942. WCCO immediately petitioned for reconsideration, asking that the grant be set aside and the application be set for a hearing. The Commission granted this petition in June, 1943, cancelling the grant and designating the application for hearing. In August of that year WNYC sought to amend its application to add the express condition that the requested authorization could be terminated without an advance notice of hearing. That condition also stated that nothing in the application would be " 'construed as a finding by the Commission that the authority herein granted is or will be in the public interest beyond the express terms thereof.' " In re City of New York Municipal Broadcasting System (WNYC), 15 Rad.Reg.(P & F) 565, 570 (1957) (Initial Decision of Hearing Examiner). WCCO then withdrew its oposition to the grant of application and in September, 1943 the Commission cancelled the scheduled hearing and granted WNYC's application.

The Special Service Authorization specified operation with a directional antenna from 6:00 a.m. to sunrise New York and sunset Minneapolis to 10:00 p.m. (EST) for a period " 'ending in no event later than 3 a.m. Eastern Standard Time, February 1, 1955.' " 15 Rad.Reg. (P & F) at 570. The SSA also contained the following condition:

"This special temporary authorization is granted upon the express condition that it may be terminated by the Commission at any time without advance notice or hearing if in its discretion the need for such action arises. Nothing contained herein shall be construed as a finding by the Commission that the authority herein granted is or will be in the public interest beyond the express terms hereof."

*Id.* at 570 n. 5.

**5.** The October, 1942 application was granted because, in addition to the war effort programs and services, WNYC's audience would be " 'sustained by program service of high entertainment value, including dramatic programs, good music and various general entertainment.' " 15 Rad.Reg. (P & F) at 572. Generally, the purpose of the proposed service during the wartime years was "to instill an appreciation of the significance of the war effort and the responsibilities of each citizen" and "to prepare the community of 7,500,000 people for any military or civil emergency that may arise in war time." *Id.*

The applications after the end of World War II "stated a threefold purpose":

(1) to instill an appreciation of the significance of Government in its role to reconvert industry, labor and the public to peacetime operation, and the responsibility of each citizen in that program; (2) to prepare the community of over 7½ million people for any exigency that may arise during the continuation of the national emergency; and (3) to educate and inform the inhabitants of the city concerning the United Nations Organization, and to highlight facts looking to a better understanding among the peoples of the World.

15 Rad.Reg. (P & F) at 572. The justifications WNYC offered for its August, 1947 application as well as for its subsequent applications were substantially similar. *Id.*

**6.** In her 1957 opinion, the Hearing Examiner explained the cause of this three-year gap as follows:

On August 29, 1951, the Commission advised WNYC that it was extending its SSA until October 31, 1951, pending further study of the so-called "KOB case", decided July 19, 1951, American Broadcasting Company, Inc. v. FCC, et al, 191 F.(2d) 492. By subsequent actions taken because the circumstances which led to the delay in acting on the application had not yet been resolved, the Commission extended the SSA for periods of 30 to 90 days, until February 28, 1955. Following the designation of the subject application for hearing in December 1954, the Commission, on its own motion, by order released February 24, 1955, extended the SSA pending a final decision in this proceeding.

authorization for the period of regular station license current at the time the application is acted upon," 15 Rad.Reg. (P & F) at 574, and designated for hearing. The Hearing Examiner determined that the Commission's rules make clear that "no duplicate nighttime service is permitted on a Class I-A frequency on a regular basis," *id.* at 631, but held that the "special and compelling needs and requirements" that WNYC serves "do not cease with the setting of the sun in Minneapolis." *Id.* at 639. She recommended that WNYC's application for an SSA to operate at night be granted. Her decision took special note that the "Commission has held that it will not consider an application for regularly licensed pre-sunrise and post-sunset operation during the pending of the Clear Channel Case."

> That the problem here involved has a relationship to the over-all problem involved in the Clear Channel case has been clearly recognized by the Commission. On numerous occasions reference to the relationship between the ultimate question to be resolved in this proceeding and the Clear Channel Hearing has been stated by the Commission. The Commission has had under consideration the so-called Clear Channel case since 1945, and as early as 1946 it was stated in an order granting an application of WNYC for SSA, "That the question presented by the instant application will ultimately be finally determined under the issues in the ... [*Clear Channel* proceeding] which is now pending." No reason appears why the situation today is, or should be regarded as any different from that in 1946 or that in 1947 or in any of the intervening period. The need for SSA operation is still temporary since the questions raised by WNYC's application for regularly licensed operation during SSA hours, which was dismissed without prejudice in 1950, cannot be decided until a decision is reached in the Clear Channel case.

*In re City of Municipal Broadcasting System*

*Id.* at 639-40. Following this reasoning, the Commission took no action on WNYC-AM's application "because of its relationship to the clear channel proceeding." *In re City of New York Municipal Broadcasting System* (WNYC), 1 Rad.Reg.2d (P & F) 463, 464 (1963) (Memorandum Opinion and Order).

In the Commission's 1961 *Clear Channel* decision establishing the scheme described above, *see supra* pp. 5-9, the Commission included a section entitled "Some Specific Problems." *Clear Channel Broadcasting*, 31 F.C.C. at 590. There the Commission noted that "[w]hile neither 640 kc ... nor 830 kc ... is authorized for use by a class II-A station, both of these frequencies should be given special attention here because of pending hearings which involve the question of additional use of those frequencies." *Id.* at 591. The Commission then described the situation of WOI, Ames, Iowa and WNYC. WOI had, since 1944, been permitted to broadcast during nighttime hours "[n]otwithstanding the fact that this operation does not meet the conditions of ... the rules concerning presunrise operation of daytime stations on clear channels." *Id.* Like WNYC, WOI's authorization to operate at night was based on a series of SSA's and temporary authority. The Commission defined these temporary authorizations as "a type ... employed in exceptional circumstances to permit uses of AM frequencies for which provision is not made in the general rules." *Id.* The issue in the pending proceeding was "whether the public interest would be served by continuing to authorize WOI's presunrise operation." *Id.*

In the next paragraph the Commission described the similar situation of WNYC and stated the issue as "whether, balancing the interference caused to WCCO against the service WNYC renders during nighttime hours, the public interest would be served by continuing to permit WNYC's nighttime operation, for which no provision is made in the AM rules governing the use of class I-A frequencies." 31 F.C.C. at 591.

As to both the WOI and WNYC proceedings, the Commission said:

We do not here decide upon or prejudice the decision in those adjudicatory proceedings. In one pertinent respect, however, it is appropriate to take action in this proceeding by way of amending the clear-channel rules to establish the basis for the regular licensing of WOI's presunrise operations and WNYC's nighttime operations so that in the event it is decided in the adjudicatory proceedings that such operations are in the public interest the way will be clear procedurally for applications to be filed for such operations on a regular basis.

*Id.* at 591–92. In Notes 1 and 2 to its amendment of rule § 3.25, entitled "Clear channels; classes I and II stations," the Commission declared that it would accept applications for "broadcast operations on 640 kc [presunrise] . . . at Ames, Iowa" and "provision of a service during some nighttime hours by a class II station operating on 830 kc at New York, N.Y." *Id.* at 605. The proviso to each note stated that the applications "will be acted upon only after and in light of the decision reached" in the pending proceeding. *Id.* at 605–06.

In disposing of petitions for rehearing, reconsideration, and stays of the *Clear Channel* proceeding, the Commission rejected as premature WCCO's argument that the Commission had, in its 1961 decision, "pav[ed] the way for *regular* operation and that Docket No. 11227 [the WNYC case] contemplates *temporary* authorization." *In re Clear Channel Broadcasting in the Standard Broadcast Band*, 45 F.C.C. 400, 410 (1962). The argument was premature, the Commission said, "in the

light of the procedural nature of our action [as to WNYC in the 1961 Report and Order] and our disavowal of entering into the hearing issues in this proceeding." *Id.*[7] The Commission also recognized and refused to foreclose the possibility that,

if WNYC should operate nighttime in a manner somewhat different than at present—e.g., with a different directional pattern and possibly a different transmitter site—it might be possible to operate with power greater than 1 kilowatt and still afford WCCO as much or even greater protection than at present.

*Id.* at 411. The merits of the question whether WNYC-AM was to be permitted to operate at night, however, was still to be decided in Docket 11227. In 1963, the FCC remanded Docket 11227 to the Hearing Examiner "to the end that the record reflect current information under the issues specified," and consolidated the hearing of WNYC's SSA and regular application for nighttime operation. 1 Rad.Reg.2d (P & F) at 464–65.

WNYC quickly responded to the FCC's suggestion. In 1964 WNYC applied for a construction permit and asked permission to broadcast at 50 kw on 830 kHz from 6:00 a.m. (EST) to 10:00 p.m. (EST) from a new site on Staten Island. Although that filing was not originally accompanied by a request for waiver of the Commission's rules, "[o]n July 7, 1964, WNYC filed a petition for waiver of the Commission's rules to permit acceptance of and consideration of the application on its merits." *In re City of New York Municipal Broadcasting System (WNYC)*, 1 F.C.C.2d 1370, 1371 (1965). The Commission found that "the

---

7. The licensee of KFI, Los Angeles also argued that the note to the amended clear channel rules "pav[ing] the way procedurally for the acceptance of applications for a presunrise operation on 640 kc at Ames, Iowa" was "outside the record" and "constitute[d] a pre-judgment of the adjudicatory issues." *In re Clear Channel Broadcasting in the Standard Broadcast Band*, 45 F.C.C. at 405. The Commission rejected these contentions, saying:

The rules expressly provide that such application will be acted upon only after and in light of the decisions reached in that docket. We

fail to see how it can seriously be contended that merely permitting such application suggests pre-judgment. By our procedural action we have not modified KFI's license, nor have we made any substantive findings as to the adjudicatory matters.

*Id.*

WCCO raised the same objections with respect to the operation of WNYC. The Commission rejected these contentions as well, noting that "[t]he discussion [with respect to WOI] is equally applicable to WCCO's contentions." 45 F.C.C. at 410.

50-kw directional proposed operation of WNYC during presunrise and postsunset hours will not increase radiation (above present SSA values) during nighttime hours toward the 0.5mv/m–50 percent secondary service area of WCCO" and agreed to consider the proposal on its merits. *Id.* at 1373.

In 1967 the Commission reaffirmed its acceptance of the construction permit application and the accompanying request for waiver of the Commission's rules. *In re City of New York Municipal Broadcasting System (WNYC)*, 8 F.C.C.2d 1047 (1967). WNYC-AM's proposal, the Commission declared, was "clearly within the scope of the ... invitation." *Id.* at 1049. The Commission also specified eleven issues to be tried in the consolidated dockets, *id.* at 1053–54, one of which was framed as follows:

> 3. To determine whether, in light of the interference that it would receive, the proposed 50–kw nighttime operation of station WNYC would be consistent with the requirements of the note to section 73.24(b) of the Commission's rules and, if not, whether circumstances exist which would warrant a waiver of that section.

*Id.* at 1053.[8]

In 1968, acting on a request by WCCO to add, modify, and delete a number of issues, the Commission's Review Board rejected WCCO's argument that issue number 3, quoted above, was not properly framed. *In re City of New York Municipal Broadcasting System (WNYC)*, 11 F.C.C.2d 287, 293–94 (1968). The Board acknowledged that if the text of the Commission's rule as to clear channel were to be applied literally, WNYC's application would have been precluded in the first instance. In the Board's view the note to the rule clearly contemplated, and in fact invited, WNYC's application. The Board also added the following issue:

> To determine whether and to what extent WNYC-FM can be utilized to meet presunrise and postsunset needs and requirements of the areas proposed to be served by WNYC's 50–kW proposal.

*Id.* at 303. In adding this issue, the Board relied on the Commission's policy of "regard[ing] FM radio [as] a component part of total aural service." *Id.* at 292, *citing In re AM Station Assignment Standards*, 25 Rad.Reg. (P & F) 1615 (1963), and *In re Pre-Sunrise Broadcast Rules (Docket 14419)*, 11 Rad.Reg.2d (P & F) 1571 (1967). The Board noted that the Commission had taken FM service into account in resolving a variety of different types of cases. 11 F.C.C.2d at 292, *citing Easton Publishing Co. v. FCC*, 175 F.2d 344 (D.C.Cir.1949) (section 307(b) case); *In re Richmond Broadcasting Co.*, 25 Rad.Reg. (P & F) 181 (1963) (same); *In re Radio Rockford, Inc.*, 6 Rad.Reg.2d (P & F) 907 (1966) (waiver of allocation standards).

Finally, in refusing to delete an issue considering the comparative merits of WCCO's and WNYC's programming in relation to their respective areas, the Board recognized the uniqueness of this case.

> [T]his is not the prototype 307(b) or interference case; it contains elements of both. The unusual nature of this case, making the submission of programming evidence particularly important, is demonstrated by the allegations relating to the following: The great distance separating the two stations; the nature of the municipal licensee in New York; the noncommercial and sustaining character of its programing proposal; the "multiservice" type of programing presented on the Minneapolis station; the peculiar and large area in which the two signals interfere; and, finally, the very nature of this proceeding whereby an existing service (WNYC) is operating on a clear-channel

---

8. Although oddly worded, this issue was clearly aimed at a determination whether WNYC's interference with WCCO's area of secondary service was justified. The concern has never been the interference WCCO would cause to WNYC's area of proposed service. That the issue is stated that way is irrelevant, for if radio station A's signal interferes with radio station B's signal, obviously radio station B's signal interferes with that of A.

frequency under temporary authorization.

11 F.C.C.2d at 299.

The Commission affirmed the Review Board's decision that the Hearing Examiner consider the "availability of WNYC-FM as a possible alternative means of meeting whatever needs may exist for additional [nighttime] hours of operation for WNYC." *In re City of New York Municipal Broadcasting System*, 29 F.C.C.2d 244, 246 (1971).[9] The Commission agreed with the Review Board that programming was germane to the proceeding and modified the programming issue to make it consistent with the programming issue specified in *In re Iowa State University of Science & Technology*, 19 F.C.C.2d 36 (1969) ("WOI"). 29 F.C.C.2d at 248-49. Most important, however, was the Commission's statement of the "ultimate issue" in this case:

The ultimate issue in this proceeding ... is to determine, in the light of the evidence adduced with respect to the other issues, which, if either, of the WNYC applications should be granted. This is not a comparative hearing between WNYC and WCCO. WCCO is not an applicant. WNYC is the applicant, and as such, properly has the burden of establishing that its proposed presunrise and postsunset program service would serve special needs and requirements of the populations and areas proposed to be served by it and, further that the public interest would be served by such proposed program service, in the light of the nature and character of WCCO's program service to the areas and populations affected by interference from WNYC.

*Id.* at 249, *citing WOI*, 19 F.C.C.2d at 45–50.

The twenty-one issues and one condition involved in the consolidated dockets were tried at twenty prehearing and sixty-nine hearing sessions over a period of fourteen years.[10] The record was finally closed on August 24, 1977. In 1979, the Administrative Law Judge issued his decision of 189 pages together with myriad findings of fact, in which he concluded that although "WNYC has made its own case difficult by failing to follow Commission guidelines and requirements as to ascertaining the community needs and programming ... the public interest requires the granting of the 50 kW proposal which subsumes the request for permanent authority for the SSA hours for the present 1 kW operation." *In re City of New York Municipal Broadcasting System (WNYC)*, 91 F.C.C.2d 659, 663 (1978) (Supplemental Initial Decision).

On review, the Commission reversed, concluding that "WNYC has not established that its programming is required to satisfy the special needs and requirements of its service area which would justify its interference to clear channel station WCCO, Minneapolis, Minnesota." *In re City of New York Municipal Broadcasting System (WNYC)*, 91 F.C.C.2d 635, 639 (1982). After the Commission denied WNYC's petition for reconsideration, WNYC filed this appeal.

**II.**

WNYC's basic argument on appeal is that the Commission erred in deciding that the public interest would best be served by denying WNYC its 50 kW proposal.

---

**9.** In rejecting WNYC's argument that "FM service is not an adequate substitute for AM service," the Commission stated its belief that

the availability of WNYC-FM as a possible alternative means of meeting whatever needs may exist for additional presunrise and postsunset hours of operation for WNYC is a proper matter for consideration in this proceeding ....

29 F.C.C.2d at 246. The Commission found support for its position in the *WOI* case, In re Iowa State University of Science & Technology,

19 F.C.C.2d 36, 48, 49 (1969), where the Commission expressly considered the availability of WOI-FM as an alternative means of presenting presunrise programming. *Id.*

**10.** This proceeding was consolidated with WCCO's application for a "Franklin" antenna. The Commission eventually denied WCCO's request on the grounds that the antenna constituted a hazard to air navigation. In re City of New York Broadcasting System (WNYC), 91 F.C.C.2d 635, 649-55 (1982).

WNYC advances this argument not only by challenging the Commission's overall decision, but also by attacking the components of that decision. For example, WNYC asserts that it was wrong for the FCC to rely on the *WOI* case in deciding whether WNYC met the "special needs and requirements of its service area," *In re City of New York Municipal Broadcasting System (WNYC)*, 91 F.C.C.2d 635, 643–44 (1982), *citing WOI*, because the issues in that case were "decidedly different" than the issues in this case. Reply Brief of Appellant WNYC at 5. WNYC further asserts that this is not a waiver case at all, and that the deference generally due to the agency in those types of cases is inappropriate here. We first address the latter contention, because it is said to affect the standard which we must use in reviewing the agency's action. Next we examine WNYC's challenge to the components of the Commission's decision, especially the use of the *WOI* test and the consideration of WNYC-FM as an alternative to WNYC-AM. Finally, we consider the overall public interest determination.

## A.

█ WNYC vigorously contends that this is not a waiver case, for the amended clear channel rules expressly provide for the acceptance of WNYC's application. Therefore, argues WNYC, the waiver cases are inapposite, as are those cases involving violations of Commission rules. At oral argument, counsel for WNYC conceded that if the waiver standard is applied, it would be "virtually impossible" for this court to reverse the Commission. But, contends WNYC, they did not litigate a waiver case; waiver was never the issue, the public interest was.

While we believe this was, in essence, a waiver case, we do not think a contrary conclusion would affect our standard of review sufficiently to affect the outcome of the case.

WNYC is right in stating that this is not a typical waiver case: it is not the type of waiver case where the FCC refused to ac-

cept for filing an application that would violate one of its established rules. *See, e.g., ICBC Corp. v. FCC*, 716 F.2d 926 (D.C.Cir.1983); *WAIT Radio v. FCC*, 459 F.2d 1203 (D.C.Cir.), *cert denied*, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972). The 1961 amendment to the clear channel rules did provide for acceptance of WNYC's application. WNYC, however, places more weight on that amendment than it will bear. The Commission made clear long ago that the note to the amendment of the clear channel rules merely "pave[d] the way *procedurally* for the acceptance of" WNYC's application if determined by the Commission to be in the public interest. *In re Clear Channel Broadcasting in the Standard Broadcast Band*, 45 F.C.C. at 405 (emphasis added). *See supra* note 4. In no way did the amendment "constitute[ ] a pre-judgment of the adjudicatory issues." 45 F.C.C. at 405. The 1961 amendment eliminated the " 'high hurdle' " that an applicant for waiver faces " 'even at the starting gate.' " *WAIT Radio*, 459 F.2d at 1207, *quoting WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C.Cir.1969); it did not lower all of the obstacles in WNYC's path. The inescapable fact is that WNYC is a Class-II station seeking authority to broadcast at night on a clear channel station and that the Commission's rules prohibit this.

Moreover, this case has always been viewed as a request for a waiver, albeit a somewhat unique one. For example, the Hearing Examiner in 1957 explicitly discussed the waiver issue in recommending that WNYC's SSA be extended. She characterized the rule providing for SSA's as a "recognition of th[e] basic principle" that the Commission "is not the prisoner of its own regulations and that the public interest … must always take precedence over strict compliance with the provisions of the Rules," 15 Rad.Reg. (P & F) at 635–36, and noted that

[t]he courts also recognize and sanction this principle …. The Supreme Court and the Court of Appeals have both recognized that there are circumstances

where the Commission's Rules must be waived to authorize operations contrary to their specific terms.

*Id.* at 636, *citing United States v. Storer Broadcasting Co.,* 351 U.S. 192 (1956); *City of New York Municipal Broadcasting System v. FCC,* 223 F.2d 637 (D.C.Cir. 1955). And in 1964, along with its application for a construction permit, WNYC itself filed a petition for waiver of the Commission's rules. *In re City of New York Municipal Broadcasting System (WNYC),* 1 F.C.C.2d 1370, 1371 (1965). Finally, although the Commission did not expressly discuss the issue in the decision now under review, the Commission has styled this proceeding as a request for waiver. Issue six in this proceeding states that the Commission would

determine whether, in the light of the interference that would be received, the proposed 50kw nighttime operation of station WNYC would be consistent with the Commission's rules, and, if not, whether circumstances exist that *would warrant a waiver of that section.*

*In re City of New York Municipal Broadcasting System (WNYC),* 33 F.C.C.2d 285, 289 (1972) (emphasis added). That WNYC has been granted temporary authority to operate at night does not lighten the "heavy burden" that it must bear in seeking a waiver of established rules, *WAIT Radio,* 459 F.2d at 1207, although the grant of temporary authority is somewhat probative of what the FCC considers to be in the public interest. Both the history of this case and a common-sense look at what WNYC is asking for indicate that this is and has always been a waiver case, however unique or special. WNYC's argument that the Commission decided a case not litigated must fail.

■ Whether or not this is a waiver case, section 706 of the Administrative Procedure Act specifies the scope of our authority when reviewing an agency's determination. 5 U.S.C. § 706 (1982). We are to set aside an agency's action only where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and, where a hearing has been held, if the agency's determinations are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E) (1982). This statute adequately defines our task here. In reviewing the Commission's determination we cannot lose sight of the fact that granting WNYC's request would involve making an exception to the current rules prohibiting stations of its type from broadcasting at night on clear channel frequencies and that those exceptions are rarely granted. We also review this decision bearing in mind the deference we owe "the Commission's recognized expertise on ... technical issues." *WSTE–TV, Inc. v. FCC,* 566 F.2d 333, 335 (D.C.Cir.1977).

**B.**

■ In reversing the decision of the ALJ, the Commission made findings as to six of the issues: Issue 1—WNYC's areas and populations; Issue 3—WNYC interference with WCCO; Issues 10 and 11—WNYC's programming and New York City's special needs and requirements; Issue 13—the use of WNYC to satisfy needs; and, Issue 15—fair, efficient, and equitable distribution of radio service.

As to Issue 1, the Commission accepted the ALJ's findings that the proposed 50 kW nighttime operation would increase WNYC's nighttime coverage from slightly over 50% to 99.7% of New York City—a population of 7,869,972. The Commission also found that New York City has licensed to it twenty-eight full-time commercial aural services and three educational stations, with an additional eighteen commercial aural services and four educational stations licensed within the New York Standard Metropolitan Statistical Area outside of New York City. No area in WNYC's current or proposed nighttime service areas receives fewer than five primary nighttime aural signals. 91 F.C.C.2d at 639.

WNYC does not contest these findings; in fact, WNYC's Initial Brief rehearses them at length, all to the end of demonstrating that the population that is losing primary nighttime service which has been

available to them since 1942—numbering 4,388,100—is "greater than that of many states of the Union." Initial Brief of Appellant WNYC at 18-19. That is true, but as the Commission found with respect to Issue 3—WNYC interference with WCCO —WNYC's 1 kW nighttime operation causes objectionable interference in a large portion of WCCO's area of secondary service, including portions of Michigan, New York, Pennsylvania, Ohio, West Virginia, Kentucky, Tennessee, and Mississippi. Also, although "WNYC's proposed 50 kW operation would, because of directionalization, result in a reduced amount of interference, [it would still affect] 7,158,600 people in 125,800 square miles." 91 F.C.C.2d at 640. This would include 51,000 people with no primary aural signals (white areas) and 195,100 people with only one other primary aural signal (gray areas), although all portions of the interfered areas receive at least ten other secondary services. *Id.*

The most important of WNYC's arguments is that since 1924 it "has a consistent history of programming in the public interest and serving special needs and requirements," Initial Brief of Appellant WNYC at 35, and that the value of this programming outweighs that of "yet another secondary service in an area served by at least ten other secondary services and in an area to

which WCCO does not now—nor does it in the future intend to—program." *Id.* at 24. Apparently aware that the strength of its programming is the most compelling reason in favor of granting its application, WNYC's brief discusses at length the 45% of broadcast time devoted to public affairs, instruction and information, the 35% of time given to classical music programs, the 20% of time spent on spoken word and talk, including readings and drama, and the 5% of time dedicated to folk and ethnic music.[11]

The Commission did not ignore WNYC's programming. In fact, the Commission expressly found that WNYC's programming "is highly meritorious and that curtailing such programming would be undesirable." 91 F.C.C.2d at 642. But, according to the Commission, "[t]he designated issue requires WNYC to show more than that its programming is meritorious or that it serves community needs." *Id.* Relying on its decision in *WOI*, the Commission held that "a demonstration of special needs and requirements entails: first, that no other station provides the service area with substantially similar programming, and, second, that any unique programming would not be effective if presented during the day by the applicant." *Id.* at 643.[12]

---

**11.** All of these numbers are approximations, Initial Brief of Appellant WNYC at 11–12, which is presumably why they add up to 105%.

**12.** The first part of this test calls for an examination of the programming of New York City's other radio stations. As the Commission acknowledged, however, "the record is somewhat deficient in this regard, because ... a previous ALJ improvidently restricted the introduction of evidence on this point." 91 F.C.C.2d at 643 (footnote omitted). Nevertheless, the Commission concluded that it was "able to draw meaningful conclusions based on the existing record"—"an assessment of other stations by WNYC's Program Director" and "a survey by WCCO of programming listed in other station[s'] renewal applications." *Id.* at 643 & n. 26.

WNYC contends that it was "grossly unfair" and "reversible error for the Commission to base its decision upon an issue as to which WNYC was precluded from submitting evidence." Initial Brief of Appellant WNYC at 43. Moreover, according to WNYC, the evidence

submitted by WCCO about other stations' programming "lack[s] probative value." *Id.*

Although a comprehensive record is obviously preferable to one that is "somewhat deficient," we do not think the Commission committed reversible error by relying on this evidence to draw conclusions about other stations' programming. We think so for three reasons. First, the evidence presented by WCCO and relied upon by the Commission was based upon the renewal applications submitted by radio stations seeking to renew their licenses. These are official documents on file with the Commission and it was not arbitrary for the Commission to assume that they are not "a bunch of lies." Initial Brief of Appellant WNYC at 44, *citing* Transcript at 5488. Second, it is relatively common knowledge that "other New York Metropolitan area stations provide substantial amounts of information programming, minority oriented programming, and classical music." 91 F.C.C.2d at 644. Finally, WNYC itself submitted evidence on this point that the FCC considered.

WNYC attacks the Commission's use of this test on two grounds. First, WNYC argues that it was improper to rely on the *WOI* case because the issues were so different. Reply Brief of Appellant WNYC at 4–7. Second, even accepting the applicability of *WOI*, the record is said to support a finding that WNYC met the test prescribed to demonstrate the special needs and requirements as determined in that case. Initial Brief of Appellant WNYC at 40–42. We address these contentions in order.

The Commission was completely correct in characterizing the *WOI* case as the "leading, if not the only, precedent" for this case. Brief for FCC at 33. As we have shown, throughout the long history of this proceeding the Commission has drawn numerous parallels between the situation of WOI and of WNYC. *See supra* pp. 10–11 & note 9. Aside from a limitation to 1 kW of power applied to WOI and not WNYC, the substance of the notes to amendments to the clear channel rules are indistinguishable. The factual situations are almostly exactly the same—Class II stations whose nighttime operation caused co-channel interference to a dominant clear channel station. That WOI interfered with its competitor's primary service goes only to the extent of the interference—a factor to be balanced against the special needs and requirements of the local areas served by the interfering stations. WNYC contends nevertheless that the *WOI* case is inapposite because the issue there was framed differently than was the issue here. Comparison of the two is worthwhile to demonstrate both the similarity of the issues and the slenderness of the reed on which WNYC rests. The programming issue established by the FCC in *WOI* was phrased as follows:

> To determine the type and character of program service to be rendered by the proposed presunrise operation of Station WOI, *whether the same general program service is being rendered by any other station or stations serving all or part of the area proposed to be served by station WOI*, and whether the proposed WOI program service would serve any special needs and requirements of the population and areas proposed to be served.

19 F.C.C.2d 36, 42 (1969) (emphasis in original). The programming issue delineated for WNYC was:

> To determine the type and character of the program service proposed to be rendered by station WNYC and whether and to what extent WNYC's daytime and nighttime proposed programming would serve special needs and requirements of the populations and areas proposed to be served.

*In re City of New York Municipal Broadcasting System (WNYC)* 33 F.C.C.2d 285, 290 (1972).[13]

WNYC argues from this that WOI was required to prove that its programming was unique or essential whereas WNYC had only to show that its programming served special needs and interests. Reply Brief of Appellant WNYC at 5. This argument is unconvincing. Whether a radio station is serving an area's "special needs and requirements" necessarily involves a determination whether other radio stations are addressing those same needs. An area's needs cannot truly be said to be "special" such that an additional station is necessary unless those needs are underserved. Otherwise, by WNYC's logic, the Commission intended for it to be given its exemption even if all 53 stations in the New York metropolitan area were addressing the needs of a group special to New York City—United Nations diplomats, for example. Plainly that is not what the Commission intended. Both *WOI* and this case involved extraordinary circumstances which the Commission had specially considered when amending its clear channel rules. Even though the facts of *WOI* were

---

**13.** The similarity of these two proceedings is further demonstrated by the fact that the programming issue the Commission established for WNYC in 1954 was word for word the same as the issue in the WOI proceeding. *In re City of New York Municipal Broadcasting System* (WYNC), FCC 54–1463 (Dec. 6, 1954); J.A. at 2.

not the same in all respects as the facts here,[14] the long history of this proceeding compels the conclusion that the Commission acted properly in considering *WOI* in deciding WNYC's case.

We turn next to the Commission's application of the *WOI* test. The Commission first found that while "[a]t least some of WNYC's programming appears to be unique" when compared with the programming of other stations, and that "SSA hours are used for at least some of these programs ... other stations do provide at least a rough equivalent of WNYC's programming" in a number of other substantive areas. 91 F.C.C.2d at 643–44.

On balance, we find it most significant that other New York Metropolitan area stations provide substantial amounts of information programming, minority oriented programming, and classical music, supplementing that of WNYC. The fact that these stations may not provide the breadth of WNYC's programming or that in some narrow subcategories other stations do not provide programming similar to WNYC's is not as significant. Moreover, the fact that with few exceptions, such as live coverage of hearings, WNYC's programming culd [sic] be broadcast during the day and still benefit New Yorkers, strongly militates against a finding that the SSA hours are necessary to serve the special needs and interests of New York City.

*Id.* at 644.

WNYC contends that the record in no way supports this conclusion, for "there is no other broadcast station in New York, or the area, which can compare to WNYC in

quantity or quality of public service programming." Initial Brief of Appellant WNYC at 44. The Commission's decision is not inconsistent with this assertion. The Commission simply determined that other stations, taken as a whole, provide substantially similar programming, though lacking some of the breadth of WNYC's programming. This is a rational determination, supported by substantial evidence, and we cannot displace it. Moreover, this finding is not crucial to the Commission's holding in this case, for the Commission also found that much of WNYC's programming could be broadcast during the day and that WNYC-FM, which broadcasts at night, "can adequately substitute for any loss of service from WNYC." 91 F.C.C.2d at 644.[15]

## C.

WNYC also challenges the determination that WNYC-FM is a suitable substitute for time lost to the AM station on two grounds: (1) that "the FCC's suggestion that WNYC programming be run on WNYC-FM is directly contrary to established Commission policy ... requiring ... separate programming over AM and FM facilities;" and, (2) that "two broadcast facilities (WNYC and WNYC-FM) totally and exclusively programming to the public service and serving separate needs cannot assume the functions of one another without a concomitant (and here severe) loss to the public." Initial Brief of Appellant WNYC at 46–47.

We see no reason to doubt the Commission's finding that "[t]here are no technical or legal obstacles to shifting programming from WNYC to WNYC-FM." 91 F.C.C.2d

**14.** As WNYC correctly points out, there are differences between the *WOI* case and the situation here. For example, WOI was causing interference to KFI's area of primary service and the unique program that the Initial Decision granting authority had been predicated upon was being carried at the same time by another AM station. Initial Brief of Appellant WNYC at 41–42. A case need not be identical, however, to be relied upon for support. This is particularly true where, as here, the case relied upon is the only other case to arise in the same unique procedural setting as the case being decided.

**15.** It is for this reason, too, that the Commission's use of the evidence submitted by WCCO as to the programming of other stations does not constitute reversible error. The other grounds for the Commission's decision—that the loss of time can be compensated for by shifting programming to WNYC–FM or to daytime hours—are more than sufficient to support the Commission's decision.

at 647.[16] To the extent that separate programming is necessary to satisfy Commission nonduplication policy and the requirements of National Public Radio funding, we note that there has been a "significant amount of duplication between the AM and FM schedules"—as much as 20% since 1972 and nearly 40% prior to 1972. *Id.* at 647 & n. 45. It is certainly rational for the Commission to conclude that reducing this duplication would not adversely affect the public interest.

As for WNYC's second contention, we agree that it would be preferable for New York City listeners to have WNYC-AM and WNYC-FM each broadcast independently for the maximum number of hours possible. The public interest is somewhat harmed by placing WNYC management in a position where it must compensate for loss of SSA hours to WNYC-AM by broadcasting over WNYC-FM programming it would have preferred to broadcast over WNYC-AM. The precise extent of the harm, however, and whether it is offset by the added service to those in WCCO's area of secondary service, is a matter within the special competence of the Commission to decide. *See infra* p. 31. Moreover, the Commission was plainly correct in noting that the loss of WNYC's SSA authority would be mitigated in part if WNYC were

to replace some of the classical musical programs carried by WNYC-FM with informational programming. Other New York stations continue to broadcast classical music formats.

Finally, the Commission has in the past, in *WOI* as well as in other cases, viewed FM as a substitute for AM. 91 F.C.C.2d at 646 & nn. 36, 37, *citing WOI* and *Presunrise Operation,* 18 F.C.C.2d 705 (1969). *See City of New York Municipal Broadcasting System,* 11 F.C.C.2d at 291–92. *See also Easton Publishing Co. v. FCC,* 175 F.2d 344 (D.C.Cir.1949); *In re Radio Rockford, Inc.,* 6 Rad.Reg.2d (P & F) 907 (1966); *In re Richmond Broadcasting Co.,* 25 Rad.Reg. (P & F) 181 (1963).

In sum, the Commission has previously considered the availability of FM in cases like this one, there is a substantial amount of overlap in the programming of the AM and FM station, and the FM station's programming is primarily entertainment programming. As such, we cannot conclude that the Commission acted improperly in finding that WNYC-FM is an adequate substitute for the loss of WNYC-AM's authority to broadcast at night.[17]

### D.

We come now to the heart of the matter—the public interest determination.

---

**16.** In making this determination, the Commission was disagreeing with the ALJ's finding that "technical obstacles existed to the reception of WNYC–FM." 91 F.C.C.2d at 644–45. The Commission "now recognize[s] FM as a service equal to AM with a signal of equal or superior technical quality." *Id.* at 646. WNYC does not challenge the Commission's use of FM on this ground, apparently recognizing that this is precisely the kind of "technical issue" within the FCC's expertise to which we owe a substantial degree of deference. *WSTE–TV, Inc.,* 566 F.2d at 335.

**17.** WNYC also objects that the Commission made arbitrary use of official notice in considering 1979 figures from the Electronic Industries Association on the degree of FM set penetration as well as recent Arbitron data. This data indicates that nearly 75% of all home radios and more than 50% of all automobile radios have FM capacity, that more than half of the radio listening in New York City is accounted for by FM, and that ten of the top twenty radio stations in New York are FM stations. 91 F.C.

C.2d at 646. WNYC objects that interjecting these 1979 figures into a record that was closed in 1977 was "patently untimely." Initial Brief of Appellant WNYC at 51. WNYC, however, did not accept the Commission's invitation to "rebut this information by filing [a] petition [] for reconsideration," 91 F.C.C.2d at 645 n. 34, neither did WNYC request additional time to contest the data or to submit contrary evidence. Moreover, we think that this is precisely the sort of fact of which an agency may take official notice. *See generally* Fed.R.Evid. 201(a) advisory committee note ("Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."); 3 K. Davis, *Administrative Law Treatise* § 15.11, at 185 (1980) ("Should Disputable Legislative Facts Be Noticed? The clear answer is: Of course.").

The issue in this case has always been "whether, balancing the interference caused to WCCO against the service WNYC renders during nighttime hours, the public interest would be served by continuing to permit WNYC's nighttime operation, for which no provision is made in the AM rules governing the use of class I-A frequencies." *In re Clear Channel Broadcasting in the Standard Broadcast Band,* 31 F.C.C. 565, 591 (1961). The balance, however, did not begin in equipoise. From the start, it tilted toward WCCO and the Commission's rules. As the Commission said, ·

> [t]his is not a comparative hearing between WNYC and WCCO. WCCO is not an applicant. WNYC is the applicant, and as such, properly has the burden of establishing that its proposed presunrise and postsunset program service would serve special needs and requirements of the populations and areas proposed to be served by it and, further that the public interest would be served by such proposed program service, in the light of the nature and character of WCCO's program service to the areas and populations affected by interference from WNYC.

29 F.C.C.2d at 249.

WNYC's general contention is that the public interest is not served by extinguishing the nighttime public service it provides to four million people, and denying enhanced service to another ten million, in order to provide an additional secondary service to areas served by at least ten other secondary services. This is especially true, argues WNYC, where the station providing that additional secondary service does not gear its programming to the area in which it interferes. Initial Brief of Appellant WNYC at 38–39. This argument is not without some force, and it was good enough to convince the ALJ. But the Supreme Court has made clear that

> the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference. See, *e.g., FCC v. National Citizens Committee for Broadcasting,* [436 U.S.

775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) ]; *FCC v. WOKO, Inc.,* 329 U.S. 223, 229 [67 S.Ct. 213, 216, 91 L.Ed. 204] (1946) .... The Commission's implementation of the public-interest standard, when based on a rational weighing of competing policies, is not to be set aside by the Court of Appeals, for "the weighing of policies under the 'public interest' standard is a task that Congress has delegated to the Commission in the first instance." *FCC v. National Citizens Committee for Broadcasting,* [436 U.S.] at 810 [98 S.Ct. at 2119].

*FCC v. WNCN Listeners Guild,* 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981).

Here, the Commission reationally weighed the competing policies. That weighing led it to the conclusion that "considerations of fair, efficient, and equitable service favored granting WNYC's 50 kW nighttime proposal." 91 F.C.C.2d at 647. To the Commission, the meritorious nature of WNYC's programming was outweighed by: the importance of clear channel broadcasting and the interference with a large portion of WCCO's clear channel service; the fact that WNYC's nighttime services are not essential to serve special needs and requirements as the Commission defined those terms in *WOI;* the substantial amount of similar programming of the same general type (although not of the same breadth and intensity) provided by other New York City stations; that most of WNYC's SSA programming would be equally effective during the day; the availability of WNYC-FM to serve as a substitute for especially important nighttime programming; the "exceptionally large complement of both commercial and noncommercial stations" serving New York City; and the extent to which the interference areas, including the white and gray areas, are less well served. *Id.* at 648.

It is to be regretted that the many years of outstanding programming provided WNYC-AM at night will now come to an end. But we recognize that while residents

of New York City suffer a loss, listeners in parts of eight different states will now have an opporutnity, previously denied to them, to enjoy the programming of WCCO. Choosing between these two groups was a determination for the Commission. After many years of careful consideration, the Commission has concluded that "the limited AM operation as supplemented by the FM operation should be sufficient to meet the realistic special needs of New York City and that WNYC has not met the heavy burden of justifying a waiver of the fundamental allocation policy involved here." 91 F.C.C.2d at 648. The Commission's decision was based upon full exploration of the issues and is amply supported by the evidence.[18] It must therefore be

*Affirmed.*

---

**18.** WNYC's final argument, first advanced in its petition for reconsideration, is that greater interference to WCCO's secondary service area is caused by station YVLT in San Antonio, Venezuela, and that the Final Acts of the Regional Administrative MF Broadcasting Conference (Region 2), Rio De Janiero, December 19, 1981, to which the United States is a signatory, accepted interference from a foreign station to the skywave service area of WCCO. Petition for Reconsideration of WNYC at 4–5; J.A. at 647– 48. WNYC argues that "[b]ased upon the domestic criteria, the interference caused by YVLT to WCCO far exceeds the interference caused by the proposed 50 KWDA operation of WNYC on 830 kHz." Petition for Reconsideration of WNYC at 5; J.A. at 648. Therefore, "the interference accepted by virtue of *The Final Acts* to the service area of WCCO substantially and critically undermines the basis of the *Decision* herein." Petition for Reconsideration of WNYC at 6; J.A. at 649.

The Commission properly rejected this argument on two grounds. First, WNYC's argument was untimely, and therefore procedurally defec-

tive. Station YVLT has been broadcasting over 830 kHz at 50 kW power, nondirectional, since 1974. In re City of New York Municipal Broadcasting (WNYC), FCC 83–232, at 2 (1983) (Petition for Reconsideration); J.A. at 672. The physical fact of interference from YVLT was therefore not newly discovered evidence and could have been raised at the hearing. *Id.* Second, the additional interference to WCCO from WNYC is not *de minimis* because: "approximately 710,000 people in an area of about 13,- 758 square miles would be subject to interference from [WNYC's] proposed operations, but not from YVLT's"; the signals of WNYC and YVLT will often interfere with WCCO's protected signal at different times and in different places; and, "WNYC's signal, when combined with the signal from YVLT, substantially increases the interference within WCCO's groundwave and protected skywave service contours." Petition for Reconsideration at 3; J.A. at 673. This increase in interference is due to the fact that radio interference is additive. *See* R. Gagliardi, *Introduction to Communications Engineering* 103–04 (1978).